[No. C012464. Third Dist. Sept. 24, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
REGINALD CALVIN SMITH, Defendant and Appellant.

## COUNSEL

Eileen S. Kotler, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Roger E. Venturi and Gelacio L. Bayani, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BLEASE, Acting P. J.**—The defendant, Reginald Calvin Smith, was convicted after a jury trial of the offense of assault with a deadly weapon (ADW) upon the person of a peace officer, Penal Code section 245, subdivision (c).[1] Imposition of sentence was suspended and he was placed on probation on condition he serve five months in the county jail.

The incident arose when a line of police officers blocked traffic on a highway. According to the defendant he had been directed by an officer to drive his car forward; he did so and his car inadvertently struck an officer.

The defendant contends the trial court prejudicially misinstructed the jury on the mental state required for the offense. The jury was instructed under former CALJIC No. 9.00 (5th ed. 1988) that assault requires a general criminal intent. The jury sent a note to the court asking whether "the intent to move the vehicle forward, *alone* constitute[s] 'general criminal intent' " or whether an "intent to injure" was required. (Italics added.)

The court did not reread CALJIC No. 9.00, which, inter alia, defined an assault as an attempt to apply physical force upon the person of another.

[1]References to a section are to sections of the Penal Code.

Instead, it read an abbreviated instruction, that the defendant must "intend[] to commit an act, the natural and probable consequence of which if successfully completed would be the application of physical force upon the person of another . . . ."[2] Thereafter the jury came back with a guilty verdict.

As we explain, in this context the abbreviated instruction directed the jury to apply a negligence standard to the assault element of the offense. The issue is whether negligence satisfies the mental state required for conviction of assault with a deadly weapon. We answer "no" and will reverse the conviction for prejudicial error.

The error cannot be deemed harmless. Under the abbreviated instruction the defendant was foreclosed from jury consideration of his theory of the defense. While the evidence would have supported a conviction under a properly worded instruction, there is evidence in the testimony of the defendant and his companion from which the jury could have acquitted him.

### FACTS AND PROCEDURAL BACKGROUND

The incident took place on New Year's Eve, at the intersection of Highway 50 and Stateline Boulevard. Officers from the El Dorado County Sheriff's Department arrived at the scene to shut down Highway 50 to pedestrian and vehicular traffic following an exuberant New Year's Eve celebration. Officers formed a "V" across Highway 50 to keep a rambunctious crowd from flowing down the highway.

Smith and his companion, Christina Jensen, had driven the preceding evening to South Lake Tahoe to celebrate. The couple dined and gambled, but neither consumed alcohol. At midnight they joined the crowd celebrating on the street. Soon after midnight Smith and Jensen decided to leave, and drove down Stateline Boulevard toward Highway 50 in Smith's Porsche.

Smith testified as follows. He and Jensen drove down Stateline, someone approached them, hit the car and yelled at Smith to get out and fight. Smith continued driving until he saw the police barricade. An officer stopped the Porsche and told Smith he would have to turn around. Smith told the officer someone down the street was shouting at him and asked the officer to allow him to go through the police lines. The officer told Smith to wait and walked to the rear of the car.

As Smith waited for the officer to return, Jensen hit him and said, "Hey! Look! They're telling you to go forward." Smith stated he drove forward

---

[2]This definition is now, in essence, CALJIC No. 9.00 (1994 rev.).

because he saw two officers motioning him forward. As he began to move forward, Smith saw the line of officers move apart, and he thought they were allowing him to proceed. Smith heard Jensen scream, and saw a person coming through the sun roof of his car. Smith then felt something hit him on the nose and someone grab his face. He heard someone yell, "You ran over my partner; you ran over my buddy."

Smith was confused and fearful that the crowd was closing in on the Porsche. He testified he thought at the time: "Just get out of here—you know—I can deal with it later—whatever it is—move now." Because he had no horn, Smith revved the car to let people know he was coming. Smith stated, "[M]y intentions at that time were to just leave—were to go until I got out of the whole situation—out of the crowd of people." Smith stopped when a patrol car pulled in front of him.

Jensen testified she watched the officer who told Smith to wait walk back to the police line. According to Jensen it was this same officer who waved them forward.

The police officers at the scene provided a different account of the events. Officer Brown, standing on Highway 50, saw Smith's Porsche inch through police barricades and stop in front of the line of officers. Brown walked up to the Porsche and told Smith he could not proceed and asked him to back up his car. Smith told Brown he wanted to drive to the other side because "someone was shooting at him from down the street." Brown told Smith to wait while he spoke with other officers to see if the cars behind Smith could turn around, allowing Smith to leave. Brown did not tell Smith he could move through the police line, nor did Brown see any other officer motion Smith forward.

As Officer Brown walked behind Smith's car, he noticed the Porsche jerk forward once or twice. Suddenly the Porsche accelerated rapidly down Stateline toward Highway 50. Officer Brown saw fellow Officer Becker on top of the Porsche as it accelerated for about 100 feet until it was blocked and stopped by a police car.

Officer Becker stood in a line with other officers forming the human barricade. Becker saw Smith's Porsche weaving through the barricades and inching toward the police line. The car stopped and two officers spoke with Smith. Suddenly the Porsche accelerated. The car struck Becker in the lower leg, ran over his toe and his right arm, breaking his watch and knocking the radio off his belt. Becker landed on top of the Porsche and his right arm went through the open sun roof. He held onto the car as it accelerated, and

grabbed Smith by the face in order to get him to stop. Becker did not require medical attention.

Officer Wilson of the South Lake Tahoe Police Department also saw Smith's car cross the police line. Wilson moved out of the way to avoid being run over. As the Porsche sped away, Wilson saw Becker riding on the Porsche's hood. After a police car blocked the Porsche, Smith slammed on the brakes and Becker fell to the ground.

Richard Hartman, a technician with the South Lake Tahoe Police, was filming the crowd from the top of a nearby casino. Hartman noticed Smith's Porsche inching its way toward the police line. Hartman did not see the Porsche hit anyone; instead he saw Becker jump on top of the car as it accelerated to approximately 30 miles per hour. Fellow Officer Olsen saw the Porsche cross the police line with Officer Becker hanging on top of the car. Olsen, fearing for Becker's safety, pulled his police car in front of the Porsche. The car stopped abruptly, throwing Becker to the ground.

Sergeant Scott of the South Lake Tahoe Police noticed Smith's Porsche moving towards police barricades. As the Porsche inched forward, Scott saw Officer Brown tell Smith to stop. Smith stopped for a moment, but then began to inch forward toward the police line. Before Brown could back the cars behind the Porsche up, Smith revved the Porsche's engine. Scott saw the car lunge forward across the police line, scattering officers. Officer Becker was hanging on top of the Porsche leaning into the sun roof.

The commander of the operation, Lieutenant Owens of the South Lake Tahoe Police Department, saw several officers motion to Smith to stop, and then approach the driver's side of the car. According to Owens, the officers directed Smith to go back and turn around; no officer motioned Smith to drive forward.

El Dorado County Sheriff Sergeant Neves, who was also on duty that night, saw Smith's Porsche lurch forward once or twice toward the police line while the officers told Smith to wait. According to Neves, Smith appeared not to listen, but instead accelerated and drove the Porsche through the police line. The officers on the police line jumped out of the way to avoid being run over.

### The Instructions

The trial court instructed the jury that the offense proscribed by section 245, subdivision (c) consists of an assault with a deadly weapon or by means

likely to produce great bodily injury, upon a person known to be a peace officer engaged in the performance of his duties.[3] Assault was defined by modified, former CALJIC No. 9.00 as an unlawful attempt to apply physical force upon the person of another, with the present ability so to do. The instruction also included that "the person making the attempt had a general criminal intent, which, in this case, means that such person intended to commit an act, the direct, natural and probable consequences of which if successfully completed would be the application of physical force upon the person of another."[4]

The defendant requested that the jury be instructed: (1) that assault with a deadly weapon requires an intent to commit a battery, a battery being any willful and unlawful use of force or violence upon the person of another and (2) that reckless conduct alone does not constitute a sufficient basis for a conviction of assault with a deadly weapon. The court refused the first request and granted the second. At the prosecutor's request the court added the following sentence: "However, if a person intended to commit an act, the natural and probable consequences of which, if successfully completed, would be the application of physical force upon the person of another, this would not constitute reckless conduct."

An hour after deliberations began the jury sent the court a note posing the following questions.

"Does the intent to move the vehicle forward, alone constitute 'general criminal intent'?"

"Is the conscious intent to injure necessary for 'general criminal intent'?"

The court responded by rereading the instructions *omitting* the instruction that defined an assault as requiring "[a]n unlawful attempt . . . to apply

[3]The instruction provided in pertinent part: "Every person who commits an assault with a deadly weapon or by means of force likely to produce great bodily injury upon the person of a peace officer engaged in the performance of his duties and who knows or reasonably should know that such a person is a peace officer and is engaged in the performance of his duties, is guilty of the crime of violation of Section 245(c) of the Penal Code."

[4]The instruction, as given, reads: "An automobile, when used to assault another, is a deadly weapon or instrument of force likely to produce great bodily injury. [¶] In order to prove an assault each of the following elements must be proved: 1. An unlawful attempt was made to apply physical force upon the person of another; 2. At the time of such attempt the person who made the attempt had the present ability to apply such physical force; and 3. The person making the attempt had a general criminal intent, which, in this case, means that such person intended to commit an act, the direct, natural and probable consequences of which if successfully completed would be the application of physical force upon the person of another."

physical force upon the person of another." Rather, in critical part, the court repeated the abbreviated instruction that, while reckless conduct alone does not suffice for conviction of ADW, that "if a person intended to commit an act, the natural and probable consequence of which if successfully completed would be the application of physical force upon the person of another, this would not constitute reckless conduct."[5]

Thereafter the jury brought in a guilty verdict.

Later, one of the jurors sent a note to the court asserting that the other jurors told him "that if any phase of the intent was to run that [defendant] should be found guilty." Another juror wrote a letter to the court describing the legal problem facing the jury. "Did he intend to assault? And that is where our problem was. The fact that [defendant] 'gunned' his engine and [lurched] through the police line was enough to find him guilty as the law was written."

## DISCUSSION

## I

### *Natural and Probable Consequences Is a Test of Negligence*

The issue of a negligence standard arises from the manner in which the court answered the jury question on the mental state required for assault by means likely to create great bodily injury.

The jury was puzzled by the provision of the CALJIC instruction that assault requires "a general criminal intent," which the jury was told means that the person making the attempt "intended to commit [the] act, the natural and probable consequence of which if successfully completed would be the application of physical force upon the person of another . . . ."

The jury pinpointed its concerns in asking the court whether "the intent to move the vehicle forward, *alone* constitute[s] 'general criminal intent' " and whether "the conscious intent to injure [was] necessary for 'general criminal intent.' " (Italics added.)

The court's answer told the jury, in the context of the jurors' questions, that the defendant need only have "intended to commit an act [moving the

---

[5]The instruction provided: "Mere . . . reckless conduct alone does not constitute a sufficient basis for conviction of assault with a deadly weapon. However, if a person intended to commit an act, the natural and probable consequence of which if successfully completed would be the application of physical force upon the person of another, this would not constitute reckless conduct. [¶] The term reckless conduct means a willful or wanton disregard for the safety of persons or property."

vehicle forward], the natural and probable consequence of which if successfully completed would be the application of physical force upon the person of another . . . ."

This is a negligence standard. It arises from the fact that, under the abbreviated instruction, the act (moving the car forward) is made culpable solely by reason of the natural and probable consequences of the act, regardless whether the defendant intended a battery.

■ "Liability for [the] natural and probable consequences [of an intended act] is regarded as legally equivalent to liability for reasonably foreseeable consequences, and is another way of expressing liability for negligence." (Williams, Criminal Law, The General Part (2d ed. 1961) § 35, p. 90; see also *People* v. *Fabris* (1995) 31 Cal.App.4th 685, 698 [37 Cal.Rptr.2d 667] ["[A]pplied as a measure of culpability, the phrase imports a negligence standard . . . ."].)

■ Under the law of criminal negligence in California, the natural and probable consequence of the culpable act is a measure of the offense. In *People* v. *Penny* (1955) 44 Cal.2d 861 [285 P.2d 926] the court said, in respect to a negligent homicide, that "[t]he facts must be such that the fatal consequence of the negligent act could reasonably have been foreseen. It must appear that the death was not the result of misadventure, but *the natural and probable result* of a reckless or culpably negligent act." (*Id.* at p. 880, italics added.) It is the forseeability that death was a natural and probable result of the defendant's conduct which made it criminally negligent. The general CALJIC instruction on criminal negligence is patterned on this passage.[6]

■ In the law of criminal negligence, the natural and probable consequences doctrine measures the forseeability of the harm which makes the act culpable. It occupies a similar role in the law of aiding and abetting. In *People* v. *Prettyman* (1996) 14 Cal.4th 248 [58 Cal.Rptr.2d 827, 926 P.2d 1013], the court explained that "[i]n *People* v. *Croy* [(1985)] 41 Cal.3d 1 [221 Cal.Rptr. 592, 710 P.2d 392], we set forth the principles of the 'natural and probable consequences' doctrine as applied to aiders and abettors: '[An aider and abettor] is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably forseeable offense committed by the person he aids and abets . . . .' " (*Id.* at p. 261; see also *People* v. *Woods* (1992) 8 Cal.App.4th 1570, 1587 [11 Cal.Rptr.2d 231].)

---

[6]CALJIC No. 3.36 provides, in pertinent part: "The facts must be such that the consequences of the negligent act[s] could reasonably have been foreseen and it must appear that the [death] [danger to human life] was not the result of inattention, mistaken judgment or misadventure but *the natural and probable result* of an aggravated, reckless or flagrantly negligent act." (Italics added.)

As with the law of negligence, the test of natural and probable consequences is an objective one. (*People* v. *Nguyen* (1993) 21 Cal.App.4th 518, 531 [26 Cal.Rptr.2d 323]. "[T]he issue does not turn on the defendant's subjective state of mind, but depends upon whether, under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant." (*Id.* at p. 531.)

■ Viewed in this light, the abbreviated instruction at issue in this case is but an application of the law of criminal negligence.

## II

### *Criminal Negligence Is Not the Measure of Culpability for Assault With a Deadly Weapon*

The cases uniformly hold that recklessness is not sufficient to establish an assault. " 'Reckless conduct alone does not constitute a sufficient basis for assault or for battery even if the assault results in an injury to another. . . .' " (*People* v. *Colantuono* (1994) 7 Cal.4th 206, 219 [26 Cal.Rptr.2d 908, 865 P.2d 704], citation omitted; see also *People* v. *Carmen* (1951) 36 Cal.2d 768 [228 P.2d 281]; *People* v. *Rocha* (1971) 3 Cal.3d 893, 898 [92 Cal.Rptr. 172, 479 P.2d 372] ["In *People* v. *Carmen* . . . we . . . held that mere reckless conduct alone cannot constitute an assault."], fn. omitted.) It is hornbook law that recklessness transcends negligence. It requires that the defendant subjectively appreciate the dangerousness of the circumstances. (See *People* v. *Watson* (1981) 30 Cal.3d 290 [179 Cal.Rptr. 43, 637 P.2d 279].) It follows that criminal negligence is not sufficient to establish an assault, an element of the offense of assault with a deadly weapon.

This is sufficient predicate to reverse the judgment in this case. The jury was palpably misled by the instruction. Nonetheless, it is important to examine the source of the error which led to the misinstruction.

## III

### *The Statutory Measure of ADW*

■ "There are no common law crimes in California . . . ." (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Introduction to Crimes, § 14, p. 18.) "[S]ubject to the constitutional prohibition against cruel and unusual punishment, the power to define crimes and fix penalties is vested exclusively in the legislative branch." (*Keeler* v. *Superior Court* (1970) 2 Cal.3d

619, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420], relying on Penal Code section 6; see also *People* v. *Guthrie* (1983) 144 Cal.App.3d 832, 844 [193 Cal.Rptr. 54]; *Lewis* v. *Superior Court* (1990) 217 Cal.App.3d 379, 399 [265 Cal.Rptr. 855].) For this reason we look to the language of the controlling statutes.

Assault with a deadly weapon is defined in section 245, in pertinent part, as "an assault . . . with a [firearm or other] deadly weapon . . . or by any means of force likely to produce great bodily injury . . . ." This definition has two elements, (1) the assault, and (2) the means by which the assault is committed. "Assault with a deadly weapon is nothing more than an assault where there is used either a deadly weapon or any means of force likely to produce 'great' bodily injury." (*People* v. *Carmen, supra*, 36 Cal.2d at p. 775.)

What mental state is required for ADW has been the subject of much confusion in the cases. The confusion stems in part from an attempt to measure the mental state by the means by which the assault is committed. Clarity is introduced once that attempt is abandoned.

The subject of assault and battery is addressed within a single chapter of the Penal Code. (Tit. 8, ch. 9 of the Pen. Code.) An assault is defined in section 240, which introduces the chapter on assaults, as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." This is the definition which applies where the term assault is used in the succeeding sections. (See *People* v. *Jones* (1981) 119 Cal.App.3d 749, 754 [174 Cal.Rptr. 218].) "An attempt connotes the intent to accomplish its object, both in law (§ 21a) and in ordinary language." (*People* v. *Lyons* (1991) 235 Cal.App.3d 1456, 1461 [1 Cal.Rptr.2d 763].)[7] Thus, "to constitute an assault, the defendant must . . . intend to commit a battery . . . ." (*People* v. *Wolcott* (1983) 34 Cal.3d 92, 99 [192 Cal.Rptr. 748, 665 P.2d 520].) This is the meaning ascribed to section 240, which has remained unchanged since it was enacted in the 1872 enactment of the Penal Code. The code commissioners said of this provision: an assault " 'must be *intentional*. If there is no present purpose to do an injury, there is no assault. There must also be an *attempt*. A purpose not accompanied by an effort to carry into immediate execution falls short of an assault.' " (Quoted in *People* v. *Colantuono, supra*, 7 Cal.4th at p. 223, (conc. opn. of Mosk, J.), original italics.)

---

[7]Penal Code section 21a defines an attempt as: "An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (See *People* v. *Swain* (1996) 12 Cal.4th 593, 604 [49 Cal.Rptr.2d 390, 909 P.2d 994].)

This definition rules out negligence. "One does not attempt to commit a crime by negligently endangering the person . . . of another, however great the danger or extreme the negligence." (Perkins, *Criminal Attempt and Related Problems* (1955) 2 UCLA L.Rev 319, 340, fn. omitted.) It also rules out recklessness. "[R]ecklessness differs from intention in that the actor does not seek to attain the harm . . . . Instead, he believes that the harm will not occur or, in an aggravated form of recklessness, he is indifferent whether it does or does not occur." (Hall, General Principles of Criminal Law (2d ed. 1960) p. 115.) A fortiori, it rules out ADW predicated upon the instruction given in this case.

Unfortunately for the cause of simplicity, the statutory approach outlined above is not consistently taken in the cases.

How then, did the natural and probable consequences language enter the law of assault with a deadly weapon?

### *People v. Rocha and the Origin of Natural and Probable Consequences in the Law of Assault With a Deadly Weapon*

The term "natural and probable consequences" was imported into the law of assault with a deadly weapon in a confusing passage in *People* v. *Rocha.* "An assault is an unlawful attempt, coupled with the present ability, to commit a violent injury on the person of another, or in other words, it is an attempt to commit a battery. [Citations.] Accordingly the intent for an assault with a deadly weapon is the intent to attempt to commit a battery, a battery being 'any willful and unlawful use of force or violence upon the person of another.' (Pen. Code, § 242.) We conclude that the criminal intent which is required for assault with a deadly weapon and set forth in the instructions[9] in the case at bench, is the general intent to wilfully commit an act the direct, natural and probable consequences of which if successfully completed would be the injury to another. Given that intent it is immaterial whether or not the defendant intended to violate the law or knew that his conduct was unlawful. The intent to cause any particular injury [citation], to severely injure another, or to injure in the sense of inflicting bodily harm is not necessary." (*People* v. *Rocha, supra,* 3 Cal.3d at p. 899, fns. omitted.)

The term "natural and probable consequences" in this passage cannot be taken to eliminate the intent to commit a battery, as that would contradict the express statement in the second sentence of the same paragraph that an

---

"[9]See footnote 13."

assault "is the intent to attempt to commit a battery . . . ."[8] The key to its meaning lies in the instructions given in the case (see 3 Cal.3d at p. 900, fn. 13). As the sentence, within which the "natural and probable consequences language" appears, says: "the criminal intent which is required for assault with a deadly weapon [is] set forth in the instructions in the case at bench . . . ." (3 Cal.3d at p. 899, fn. omitted.)

The instructions read:

" 'An assault with a deadly weapon is an unlawful attempt, coupled with a present ability, to commit a violent injury upon the person of another with a deadly weapon. Any object, instrument or weapon, when used in a manner capable of producing and likely to produce death or great bodily injury, is then a deadly weapon.

'To constitute an assault with a deadly weapon, actual injury need not be caused. The characteristic and necessary elements of the offense are the unlawful attempt, with criminal intent, to commit a violent injury upon the person of another, the use of a deadly weapon in that attempt, and the then present ability to accomplish the injury. If an injury is inflicted, that fact may be considered by the jury, in connection with all the evidence, in determining the means used, manner in which the injury was inflicted, and the type of offense committed.' (CALJIC 604, 2d rev. ed. 1958.)" (*People* v. *Rocha*, *supra*, 3 Cal.3d at p. 900, fn. 13.)

This instruction does not contain the words "natural and probable consequence." The closest it comes is in the definition of a deadly weapon as "[a]ny object, instrument or weapon, when used in a manner capable of producing and *likely to produce* death or great bodily injury . . . ." (Italics added.) The instruction says, in essence, that the offense of ADW requires an attempt to commit a violent injury (with "criminal intent") and "the use of a deadly weapon in that attempt . . . ."

From this it appears that, in referring to "natural and probable consequences," consistent with the language of section 245 (i.e., "likely to produce"), *Rocha* looks not to the battery (" 'the least touching' ")[9] which is intended, i.e., the assault, but to the target harm which the sanction for this kind of assault seeks to avert. The assault must be accomplished by means that, if great bodily injury ensued, it would be within the reach of the natural and probable consequences doctrine. That is to say, although such a harm

---

[8]Though the phrase is awkward, we see no distinction between an "intent to attempt to commit" a battery and an intent to commit a battery.

[9]See *People* v. *Rocha*, *supra*, 3 Cal.3d at page 899, footnote 12.

need not be intended, nor need it occur, it must be a foreseeable consequence of the assault. The fact that forseeability enters this second element of the offense does not diminish the mental state required of an assault, the first element of the offense.

 Thus, the offense of assault with a deadly weapon, here section 245, subdivision (c), explicitly requires (1) an assault, the mental state for which is an intent to commit a battery, and (2) the foreseeable consequence —i.e., the "likely" or natural and probable consequence—of which is the infliction of great bodily injury upon the subject of the assault. It can be seen that (1) establishes the mental state for the conduct and (2) establishes the relationship between the intended conduct and the consequence sought to be prevented by the statute.

The abbreviated instruction given in this case is in conflict with the statutory definition of ADW. It eliminates assault as an element of the offense, substituting in its place any intentional act the natural and probable consequence of which is great bodily injury, regardless whether there is an intent to commit a battery.

As an answer to the jurors' questions, the instruction allowed them to convict the defendant for criminally negligent conduct, i.e., an intention to move the car forward in circumstances in which the foreseeable consequence was great bodily injury.

IV

*People v. Colantuono*

 This case brings into sharp relief the definitional conundrums surveyed in *People* v. *Colantuono, supra*, 7 Cal.4th 206.

The defendant drew a .357 magnum revolver and pointed it at the victim. The gun discharged, hitting the victim in the neck, paralyzing him. The jury was given an instruction, derived from *People* v. *Lathus* (1973) 35 Cal.App.3d 466, 470 [110 Cal.Rptr. 921], that "when an act inherently dangerous to others is committed with a conscious disregard of human life and safety, the act transcends recklessness, and the intent to commit [a] battery is presumed."

The defendant claimed the instruction unconstitutionally relieved the prosecution of its burden of proof of the element of intent. (*People* v. *Colantuono, supra*, 7 Cal.4th at p. 212.)

The majority opinion did not sanction the use of the *Lathus* instruction. (7 Cal.4th at p. 221.) It adhered to the view that it is "technically accurate" that assault requires an " 'intent to cause [some] injury to such other person.' " (*Id.* at p. 217.) Nonetheless, it did not find error in giving the *Lathus* instruction. It reasoned that the instruction set forth criteria for an assault committed with a deadly weapon because it "defines conduct constituting an assault . . . ." (*Id.* at p. 220.) It said that the doing of an act inherently dangerous to others with conscious disregard of human life and safety is equivalent to an assault. "An act 'inherently dangerous to others' is likely to result in 'violent injury on the person of another.' (Pen. Code, § 240.) If done 'with conscious disregard of human life and safety,' the perpetrator must be aware of the nature of the conduct and choose to ignore its potential for injury, i.e., act willfully. If these predicates are proven to the satisfaction of the trier of fact, the requisite intent is not 'presumed'; rather it is *established* by the evidence." (*Ibid.*, original italics, fn. omitted.)

This conclusion is premised on the following reasoning. "Considered from this perspective, it is clear that the question of intent for assault is determined by the character of the defendant's willful conduct considered in conjunction with its direct and probable consequences. If one commits an act that by its nature will likely result in physical force on another, the particular intention of committing a battery is thereby subsumed. Since the law seeks to prevent such harm irrespective of any actual purpose to cause it, a general criminal intent or willingness to commit the act satisfies the mens rea requirement for assault. 'As Professor Perkins puts it: "Intent includes those consequences which (a) represent the very purpose for which an act is done (regardless of the likelihood of occurrence), or (b) are known to be substantially certain to result (regardless of desire)." ' (*Lathus, supra*, 35 Cal.App.3d at p. 470.)" (7 Cal.4th at p. 217.)

The critical step in this reasoning is the assumption that the "inherent danger" of the defendant's act is such that the harmful consequence of the assault must be "known to be substantially certain to result." This formulation is known to the law as a form of ascribed intention, called oblique intention by Bentham. (See Hart, Punishment & Responsibility (1968) pp. 120-121; Williams, *Oblique Intention* (1987) 46 Cambridge L.J. 417, 420; also see, e.g., *In re Stonewall F.* (1989) 208 Cal.App.3d 1054, 1061, fn. 7 [256 Cal.Rptr. 578], and authorities cited therein.)

The distinction between an ordinary intention and an oblique intention has been described as follows. "[T]he traditional view is that a person who acts (or omits to act) intends a result of his act (or omission) under two quite different circumstances: (1) when he consciously desires that result, whatever the likelihood of that result happening from his conduct; and (2) when

he knows that that result is practically certain to follow from his conduct, whatever his desire may be as that result." (1 LaFave & Scott, Substantive Criminal Law (1986) § 3.5, pp. 303-304, fn. omitted.)

Professor Perkins, whose phrase "substantially certain to result" is imported by *Colantuono*, makes the same point.[10]

"So far as actual intention is concerned, more is required than an expectation that the consequence is likely to result from the act. On the other hand it is not necessary that the consequence should be 'desired' in the usual sense of that word, although this element may become important. If one acts 'for the purpose of causing' a certain result, he intends that result whether it is likely to happen or not. As to consequences not included in his purpose he intends those, and only those, which he realizes are 'substantially certain to be produced.' " (Perkins & Boyce, Criminal Law (3d ed. 1982) p. 835, fns. to Rest.2d Torts, § 8A omitted.)

What is essential in this measure of culpability is the meaning of "substantially certain to result," as used by Professor Perkins. "What is meant [he says] is what the layman would speak of as something *'bound to happen,'* and a lawyer would refer to as an 'inevitable concomitant.' " (Perkins & Boxce, Criminal Law, *supra*, at p. 835, fn. 56, italics added.) This rules out the natural and probable consequences test as a measure of an oblique intention.

---

[10]Professor Perkins obtained the phrase from the Restatement Second of Torts section 8A. Section 8A defines intent as desire to cause a consequence of an act or belief the consequence is substantially certain to result.

The term is explained in comment b to the Restatement provision. "b. All consequences which the actor desires to bring about are intended, as the word is used in this Restatement. Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness, as defined in § 500. As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence, as defined in § 282. All three have their important place in the law of torts, but the liability attached to them will differ." (Rest.2d Torts, § 8A, com. b, p. 15.)

The term "substantially certain" in section 8A in turn is derived from section 13 of the Restatement of Torts, comment d, in pertinent part as follows. "In order that an act may be done with the intention of bringing about a harmful . . . contact . . . to a particular person . . . the act must be done for the purpose of causing the contact . . . or with knowledge on the part of the actor that such contact . . . is substantially certain to be produced. *It is not enough that the act itself is intentionally done* and this, even though the actor realizes or should realize that it contains a very grave risk of bringing about the contact . . . . Such realization may make the actor's conduct negligent or even reckless but unless he realizes that to a *substantial certainty*, the contact . . ." will result, the actor has not that intention which is necessary to make him liable . . . ." (Rest., Torts, § 13, com. d, pp. 29-30, italics added.)

An example of what is meant by "substantially certain to result" is provided in the illustrations to Restatement Second of Torts section 8A. "A throws a bomb into B's office for the purpose of killing B. A knows that C, B's stenographer, is in the office. A has no desire to injure C, but knows that his act is substantially certain to do so. C is injured by the explosion. A is subject to liability to C for an intentional tort." (Rest.2d Torts, § 8A, illus. 1, pp. 15-16.) Professor Williams provides another example. "[S]uppose that a villain of the deepest dye blows up an aircraft in flight with a time-bomb, merely for the purpose of collecting on insurance. It is not his aim to cause the people on board to perish, but he knows that success in his scheme will inevitably involve their deaths as a side-effect." (*Williams, Oblique Intention, supra,* 46 Cambridge L.J. at p. 423.)

However, real life "[e]xamples of oblique intent in relation to future consequences are probably rare in situations of interest to the law, since almost always a person who foresees an illegal consequence as the virtually inevitable result of his act will desire it (if not as a final end, then as an instrumental end)." (*Williams, Oblique Intention, supra,* 46 Cambridge L.J. at p. 422.)

These examples provide no analogy for what happened in this case. That is because there is an irrefragable distance between conduct which is known to be inherently dangerous, i.e., conduct which carries with it a *risk* that an injury[11] will ensue, and conduct which is known to have the consequence that an injury is "bound to happen." Intentional conduct risking injury is deemed reckless, which carries with it a subjective appreciation of the risk akin to implied malice in the law of murder. (See *People* v. *Carmen, supra,* 36 Cal.2d at pp. 775-776.) Reckless conduct "resembles acting knowingly in that a state of awareness is involved, but the awareness is of risk, that is of a probability *less than substantial certainty.*" (Model Pen. Code & Commentaries, com. 3 to § 2.02, p. 236, italics added.)

One might suggest that this analysis is foreclosed by the following passage in *Colantuono.* "The pivotal question is whether the defendant intended to commit an act likely to result in such physical force, not whether he or she intended a specific harm. (But see *Rocha, supra,* 3 Cal.3d at p. 899, fn. 12.)" (*People* v. *Colantuono, supra,* 7 Cal.4th at p. 218, fn. omitted.)

---

[11]We use the term "injury" in the sense in which it is employed in *People,* v. *Rocha, supra,* 3 Cal.3d at page 899, footnote 12, " 'the least touching,' " i.e., any invasion of the legally protected interest in bodily security. (See also *Duarte* v. *Zachariah* (1994) 22 Cal.App.4th 1652, 1661-1662 [28 Cal.Rptr.2d 88].) This careful usage answers the concern suggested in *People* v. *Colantuono,* 7 Cal.4th at page 213, footnote 3, that viewing assault as a crime of intention is inconsistent with the early amendment of the assault with a deadly weapon statute which deleted the requirement for an "intent to do great bodily harm."

Nonetheless, as noted, the majority opinion in *Colantuono* espouses the view that it is "technically accurate" that assault requires an " 'intent to cause [some] injury to such other person.' " (*Id.* at p. 217.) It cites as explaining a "critical analytic point" the portion of footnote 12 in *People* v. *Rocha*, *supra*, 3 Cal.3d at pages 899-900, which says that an intent to touch is a requisite of assault, and subsumes that point in its own references to " 'violent injury' " and " 'violent-injury-producing' acts." (*Colantuono*, *supra*, at p. 214, fn. 4).

 Moreover, *Colantuono* makes clear that its "conclusion does not preclude a defendant charged with assault from presenting evidence that he or she did not intend to injure or do violence to the victim." (7 Cal.4th at p. 218, fn. 10.) For that evidence to be heard the jury must be instructed in a manner that warrants its consideration, i.e., in a manner " 'necessary to enable [the jurors] to perform their function in conformity to the applicable law.' " (*People* v. *Ford* (1964) 60 Cal.2d 772, 792-793 [36 Cal.Rptr. 620, 388 P.2d 892].)

We conclude that *Colantuono* does not bar the reasoning we find compelled in this case.

### Conclusion

The "natural and probable consequence" of an intended act cannot be equated with the required intention for assault with a deadly weapon, i.e., an intended forcible and unlawful touching as a desired consequence or one that is known to be substantially certain to result. The natural and probable consequence of an intended act is a negligence standard—and this differs in two respects. First, it is objective; it does not proceed from the correct coign of vantage, what the defendant knew about the consequences of moving the vehicle forward. Second, it embodies an incorrect measure of the risk of injury; it looks to reasonably foreseeable consequences, not to consequences which are desired or which are substantially certain to result from the defendant's conduct.

In the context of this case, as demonstrated by the juror's questions to the court, the error in the instruction cannot be viewed as harmless.

In our opinion, after an examination of the entire cause, including the evidence, it is reasonably probable that a result more favorable to defendant would have been reached in the absence of this error. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## DISPOSITION

The judgment is reversed.

Davis, J., and Raye, J., concurred.

A petition for a rehearing was denied October 23, 1997, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied January 14, 1998.