Filed 1/12/16  P. v. Brown CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>GARY CLAUDE BROWN,<br><br>　　　　Defendant and Appellant. | A140952<br><br>(Solano County<br>Super. Ct. No. FCR300515) |

　　　　A jury found defendant Gary Claude Brown guilty of brandishing a hatchet and thereby committing assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)) on two individuals.  For this the trial court sentenced defendant to state prison for an aggregate term of four years.  Defendant contends the trial court erred when it:  (1) prevented the defense from showing that a prosecution witness had a history of lying to police; (2) failed to instruct sua sponte on self-defense; and (3) "undercut the defense . . . by telling the jury to ignore the defense theory of the case."  We reject these contentions and affirm.

**BACKGROUND**

　　　　The salient details are without dispute.

　　　　Amanda Hall considers herself married to Charles Baze, the named victim in one of the counts.  Her 14-year-old brother (hereafter, "Hall's brother") is the other named victim.

　　　　On the evening of June 8, 2013, Hall was returning to the spot near the Suisun Wildlife Center where Baze and Hall's brother were fishing.  She had parked her car and

1

was about to proceed down a familiar foot path, intending to bring food to the dock where Baze and Hall's brother were. Hall testified: "As I was getting out of my vehicle, I seen two gentlemen. They were coming off the boat dock or coming from somewhere, but they were getting ready to go through the gate, 'cause you have to go through a fence and get a zigzag, and then you walk down the trail to the fishing spot."

Defendant was one of the two men. Defendant, who was wearing a "flashlight thing[]" on his head, was "kneeled down tinkering in his bag." The other man asked Hall as she went past whether she was "scared to go out there" because "this is our property." She responded "This is the City of Suisun's wildlife area. This isn't your property." The other man then said, "Well, we'll see about that. Who are you going out here to see?" "I told him, 'My husband.' " Defendant was telling the other man to "shut up."

According to Hall, "I proceeded down the trail," which took "a good 5, 10 minutes." "When I got to the end of the trail, I let Charles know that, 'Hey, . . . two men were messing with me back at the gate. I don't want to walk back by myself. Will you walk me back?' " Baze took off "to go to the car to make sure everything was okay with the car," which was parked approximately half a mile away. He was gone for 15 minutes. When he returned, defendant and the other man were on the scene. In Baze's absence, the two had acted "belligerent" and made "offensive statements." This had lasted for about ten minutes, and Hall—who was five months pregnant—was scared and "didn't feel safe." She was packing up their "stuff" to leave when Baze returned.

When Baze asked "What's going on?", the other man (i.e., not defendant) tells him, "It's time for you guys to leave. This is our property." Baze responded "We ain't going nowhere," but Hall told him "Yeah, we are." Baze and the other man then commenced to exchange "verbal threats" only. After some macho posturing—"Back and forth, 'Hit me, hit me, hit me' "—defendant and the other man left. Hall testified that "we gave them a good five-minute head start. . . . and we started to leave down the trail" back to the car. Baze was "pushing the stroller. . . . because his wrist was broken" and in a cast.

Hall continued: "We get halfway down the trail, and all of a sudden from behind us we hear rustling in the bushes. . . . We each had . . . little LED flashlights,[1] and we turned around to see what happened. And before we know it, there's two guys coming at us." Defendant had a hatchet in his hand, and the other man was brandishing a beer can. Hall testified to how the ensuing fight occurred:

Defendant "[came] at us with a hatchet," which he was swinging. Defendant struck Hall's brother in the chest with the hatchet. Baze had already "knocked the other guy out," and, hearing Hall's brother cry out "He just hit me with the hatchet," turned to protect Hall and Hall's brother. Instead of fleeing, as directed by Baze, Hall was "on the phone with the 9-1-1 dispatcher while all this was going on." This was not all she was doing: "I tried to hit the gentleman that was swinging the hatchet at my husband with the fishing poles . . . I had two or three fishing poles in my hand and it didn't work . . . ."

Defendant and Baze were competing for possession of the hatchet. However, Hall testified: "I told [my brother],when [he] got hit, 'Run to the car. The police are on their way. Go.' " Hall followed her brother after "[t]he dispatcher told me to get out of there." Hall met her brother on the way back to where her car was parked. By that time, "the cops are coming up."[2] Baze arrived two or three minutes later.

Hall's brother testified, and generally corroborated Hall's testimony of events from the point at which she joined her brother and Baze at the fishing site. Hall's brother testified that defendant, ignoring his plea—"I'm only 14. Don't hit me,"—struck him in the chest with the blunt end of the hatchet, causing a wound that, although painful, did not require hospitalization.

Baze also corroborated Hall's version. He added that when Hall returned to the fishing site, he (Baze) was with a "gentleman that I was unfamiliar with that I had just met that day while fishing." According to Baze, when he got into the verbal altercation

---

[1]The stroller was being used as "kind of a cart" to carry their gear. Because of his injury, Baze was holding the flashlight in his mouth.

[2]Hall was still talking with the dispatcher. A recording of the call to 911 was played for the jury.

3

with defendant and the other man at the fishing spot, the only physical contact was the other two "bumping me with their chest[s]"—"similar to . . . roosters that are going at one another"—while "trying to provoke some type of reaction from me." No punches were thrown or landed. As Baze, Hall, and Hall's brother made ready to leave, the two men said something to the effect that "[G]ood luck finding your way back to the car." It was said in a way Baze interpreted as a threat.

After the two men left, Baze, Hall, and Hall's brother were making their way back up the trail to their car when they were confronted by the two men. Defendant held a raised hatchet, which he was swinging. Baze recollected that just after defendant appeared swinging the hatchet, Hall hit the other man with a fishing pole. The other man, who was holding a beer can in his raised hand, was "attempting to get very close to me and in a way that he is close enough to strike me," at the same time that Baze saw defendant "strike [Hall's brother] with the ax . . ."[3] Feeling he "needed to defend myself . . . and [Hall's brother]," Baze struck the man with the beer can in the jaw with his (Baze's) elbow. The man was "knocked down and unconscious."

Baze further testified that Hall's brother "was running towards [Hall] with his hand clutching his chest at the point . . . I seen the ax . . . hit him." Baze turned towards defendant, who was three to four feet away, and "once again wielding the ax in a position ready to . . . strike me." Defendant then "tries to come towards me with the ax . . . And I knew for sure that I was next, so . . . [¶] . . . [¶] . . . I kicked him in the chest." Before kicking defendant, Baze was hit in his chest with the hatchet. After Baze kicked him, defendant fell to the ground, still holding the hatchet. Baze then without success tried to "pry the ax from his hands." After grappling with defendant, and getting hit a "glancing blow" on his head with the hatchet, Baze disengaged so that he could "get away from the situation and head back to the car." Before doing so, he heard "sirens coming."

---

[3]Although Baze called it an ax, from his description of the weapon it is obvious why everyone else called it a hatchet: "I would say it was maybe about 18 inches long, wooden handle. [¶] . . . [¶] It is sharp on one end. And has a hammer type of flat end on the other side." Hereafter, except when quoting testimony, it will be called a hatchet.

4

Defendant went to his "companion" and, while "attempting to wake him up," yelled "Let's get out of here." When Baze got to where the car was parked, police were already there.

One of the officers the family spoke with at the parking area was Deputy Sheriff Craig Collins. He testified that after speaking with the family and getting descriptions of the attackers, he and other deputies went down the trail. One of the persons they encountered was defendant, who was with Thomas Ross. Defendant made a "spontaneous" statement to Collins that he and Ross had been in an "altercation with six men," and that Ross had been hit with a pipe. After being advised of his constitutional rights, defendant told Collins "he didn't make any threatening statements towards anyone." No hatchet was ever found. Ross had dried blood around his lips.

The sole defense witness was paramedic Laura Carvajal, who testified that she examined Hall's brother and Baze. Hall's brother told her that he had been in a fight and been hit with "the back of a hatchet."

## REVIEW
## The Trial Court Did Not Abuse Its Discretion
## in Denying Defendant Leave to Impeach a
## Prosecution Witness with Evidence of
## Misdemeanor Convictions

Prior to trial, defendant made a motion in limine to be allowed to question Hall about three prior convictions, two convictions for theft in 2007 and 2012, and child endangerment in 2013. However, at the hearing on the motion, defense counsel conceded she lacked documentation to prove that Hall was in fact convicted. When the trial court pressed defense counsel to explain why "these three incidences" were "relevant to this case," defense counsel responded:

"MS. RIOS: Well, in these three instances, your Honor, she was accused of committing a crime and lied to the police about her involvement and then admitted that she had lied to the police. And so, the relevance in this case is that . . . she . . . has two loved ones who may have been involved in criminal behavior and she, again, is—

5

"THE COURT: They are involved in criminal behavior?

"MS. RIOS: May have been, yes. That's for the jury to determine.

"THE COURT: Well, what are they have alleged to have done?

"MS. RIOS: Well, my position is, your Honor, that Mr. Baze, who was her husband, at some point returned to the car or maybe to look for Mr. Brown. It's my position that at that time he returned to his car for a weapon, and he, himself, introduced the weapon.

"THE COURT: Oh, he had the hatchet?

"MS. RIOS: Maybe he did. That's for the jury to determine. [¶] . . . [¶] [I]t is my position that he may have gone to the car to get a weapon; and it's also my position, unless it's proved inconsistent with what my client has told me, that [Hall's brother] at some point during their meeting in the path shown [*sic*]—used the flashlight to put it in his eyes so that he was blinded by the light. And then, he was assaulted, and he responded in self-defense.

"THE COURT: Okay. Now I'm getting somewhere. Self-defense?

"MS. RIOS: Yes.

"THE COURT: So, Baze had the hatchet, and someone flashed the light in his face, and somehow the hatchet switched hands and ended up in an injury to this other guy?

"MS. RIOS: I'm not even stating that description of the incident.

"THE COURT: Okay, he hit himself with the hatchet. How's that?

"MS. RIOS: Well, they struggled. So, it's possible, yes."

The prosecutor opposed the motion, arguing "I don't think it's relevant. We're going to deal with . . . pretty much three mini trials . . . It's very time consuming. There's lots of hearsay here, a lot of . . . victims and individuals that give the initial information that . . . the officer . . . relied and communicated to. [Hall] would need to be called. Otherwise, it's just the officer testifying to multiple layers of hearsay from various victims to get to what's, in a sense, her changing her story. I just think it's very

6

prejudicial. It's not very probative. It's very time consuming. And it's not even the victim; it's just a witness to the case."

After the matter was submitted, the following occurred:

"THE COURT: Thank you. I'm not going to do mini trials. [¶] I'll allow you the following: You can cross-examine her on the fact, the only fact that she suffered a theft conviction in 2007, and you can cross her, also, on the fact that she suffered another theft conviction in October 2012. We are not going to discuss the 2013, leaving her child alone at all. That will be my ruling. [¶] Anything else from the defense?

"MS. RIOS: Well—

"THE COURT: Thank you. People?

"MR. HORVATH: Just to clarify . . . [¶] . . . [¶] The Court's going to limit it to one?

"THE COURT: I'm going to limit it to all three. Whatever she was convicted of on '07 and 2012—

"MR. HORVATH: Okay.

"THE COURT: —which are theft related, which goes to moral turpitude, her issues around that. We're not going to get into specific statements she may have made to the police and then not made or did or not did. We're not going there.

"MS. RIOS: Although, she admitted lying. Okay.

"THE COURT: Excuse me?

"MS. RIOS: Although she admitted lying to law enforcement.

"THE COURT: I said that's where we're going. That's it."

Before commencing cross-examination of Hall, defense counsel renewed her motion out of the jury's presence: "I would like to readdress the issues in my motions in limines. Specifically, I am asking that the Court allow me to cross Ms. Amanda Hall about three incidents involving her contact with the police in 2007, in 2012, and then again in 2013 . . . . [¶] During the investigation of these three cases, the police officers all had contact with her. They questioned her about her involvement, her lack of involvement in the suspected criminal behavior, and . . . In all three occasions, she denied

7

that she was involved but then later admitted to the officers that she was, in fact, involved and admitted that she was, in fact, lying to the police. I think that this is probative evidence that the jury should hear. It obviously goes directly to the issue of her credibility. She has . . . a documented habit, of lying to the police when she is confronted with criminal behavior on her part. I think it's relevant, because in this case her family is involved. . . . and they could . . . also be involved in criminal activity, and she would have a bias to lie and protect her family. . . . [¶] . . . [I]t's very possible that she lied to the police that night. I don't know if she did or didn't. I think that is for the jury to decide . . . ."

The court reiterated its earlier ruling: "So, there's evidence that she has lied to the police before. This has been when she's been confronted on criminal behavior on her part and/or confronted with her arrest or detention, and she may have lied to the police when she was interviewed but . . . apparently then apologized. [¶] I find that very different from testimony in this case that is under oath before a jury. One, she is not confronted with any arrest or detention. I do not believe there's any evidence to show at this point that her family was involved in any criminal behavior. So, I think they're completely different. [¶] So, my earlier ruling will stand. I will allow you to cross-examine her on the . . . two theft convictions, one in '07 and one in 2012."

Defense counsel asked the court for the issue to be kept open, to "reserve ruling depending on how the testimony comes out on cross . . . if the facts support." The court was agreeable: "One of the reasons I waited to address this issue now was . . . I wanted to wait—[¶] . . . [¶]—to hear what the opening statements were. So, I heard that no hatchet was used. [¶] . . . [¶] By Mr. Brown.[4] And I wanted to wait to hear what Ms. Hall said, because it was very unclear to me as to . . . how much she actually claims to have seen or not seen before I could move forward. So, yes, it's always evolving."

---

[4]In her opening statement, defense counsel told the jury: "Now, both Amanda Hall and Charles Baze would like for you to believe that Mr. Brown used the hatchet during this altercation. However, the evidence will show that no such hatchet was used by Mr. Brown or Mr. Ross"

At the conclusion of her cross-examination, Hall testified as follows:

"MS. RIOS:  Ms. Hall, you in 2007—let me make sure that's correct.  In 2007 you were convicted of a misdemeanor petty theft; is that right?

"A.  I believe it was 2008.  But, yes, ma'am.

"Q.  Okay.  The case originated in 2007 though; is that right?

"A.  I am not sure.  It was too long ago to remember exact dates.

"Q.   Okay.  And then in August of this year, August 26th of 2013 you were convicted of three counts of petty theft?

"A.  Yes, ma'am.

"Q.  Is that true?  And you are on probation right now?

"A.  Informal probation.  But, yes, ma'am."

Although it was not formally invoked, it seems plain that the basis of the prosecution's opposition to the motion, and the trial court's ruling, was based on Evidence Code section 352, which permits a court to exclude evidence if "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  Defendant treats the ruling as resting on this provision.[5]  So do we.  That ruling can be overturned only if we conclude the trial court abused the considerable scope of discretion granted by the statute. (*People v. Merriman* (2014) 60 Cal.4th 1, 74; *People v. Cox* (2003) 30 Cal.4th 916, 955.) Defendant contends abuse is shown.  We disagree.

The trial court's remarks establish why its ruling cannot be reversed. Fundamentally, the assumption was outright mendacity.  Yet defendant's counsel could go no further than "it's very possible" that Hall actually lied.  Assuming that deliberate

---

[5]Defendant also contends the ruling violated his confrontation rights under the Sixth Amendment of the United States Constitution, but this ground was not mentioned in his moving papers or in his arguments on the motion in the trial court.  Accordingly, this unpresented constitutional argument was not preserved of review.  (Evid. Code, § 354, subd. (a); *People v. Partida* (2005) 37 Cal.4th 428, 433–435.)

untruthfulness had occurred, proving that Hall lied to police concerning prior accusations of criminal conduct against her would first require questioning her, and then, possibly, the officers to whom she had lied. Whether she had then, as the court put it, "apologized" would add a factor that might mitigate but would certainly complicate. As the court noted, lying to police when accused of criminality is a very different matter from voluntarily speaking to them as a victim. Presenting all of this would indeed pose the potential of becoming, in the trial court's words, a series of "mini trials" that might pose a considerable disruption of the jury's focus in what was, a fairly short trial.

Although certainly Hall was an important witness for the prosecution, she was not more significant than Baze or her brother. Our Supreme Court has held that misdemeanor convictions for theft, "an offense necessarily involving both moral turpitude and dishonesty" (*People v. Wheeler* (1992) 4 Cal.4th 284, 297), "may suggest a willingness to lie." (*Id.* at p. 295.) Nevertheless, the court further held that "the latitude section 352 allows for exclusion of impeachment evidence in individual cases is broad," and "empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*Id.* at p. 296.) Hall's credibility could be measured by comparing her version of events with those of Baze and her brother. Assuming that intentional falsehood could be established, we cannot conclude the trial court abused its discretion in concluding that defendant's inquiry posed a substantial danger of distracting the jury from the question of defendant's guilt or innocence of the assault charges. [6]

### No Prejudicial Error Occurred in the Refusal
### of Self-Defense Instructions

During cross-examination of Baze, out of the jury's presence, the court questioned defense counsel about her tactics. In the ensuing discussion, the court noted that "Maybe

---

[6]Had the federal confrontation issue been preserved for review, the same considerations that establish no abuse of discretion under state evidentiary standards would also show no federal violation. (*Holmes v. South Carolina* (2006) 547 U.S. 319, 326; *People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103.)

10

I am in the dark here and not able to see the relevance of anything that this has to do with an assault that occurs on the path on the way back and any defenses thereof to the assault. [M]aybe it's not this defendant. Maybe he didn't have an ax or a hatchet. Maybe he was acting in self-defense. Maybe it didn't happen. And I am good with all of that. I don't understand. Help me understand what the relevance is of whether the guy [i.e., Baze] went back to the car, leaving his wife there alone."

Counsel explained that she was intending to explore inconsistencies:

"MS. RIOS: . . . It's a series of inconsistent statements that . . . were made by Amanda Hall yesterday, inconsistent to some of his testimony at the preliminary hearing and inconsistent to some of his testimony today. [¶] . . . I would like the jury to know that he may not have introduced him [the man fishing with Baze when Hall came to the site] as he—as she claims that he did because that's another inconsistency. Yes. My position is, and I will make it clear through Charles during this cross-examination, that he left the fishing point angry and upset, as [Hall's brother] indicated, and he went to his car.

"THE COURT: What is the relevance of that, though?

"MS. RIOS: Because he goes to his—

"THE COURT: Let's say he is really pissed off. So what?

"MS. RIOS: So he went to his car. He is so pissed off, he leaves his pregnant girlfriend, whatever she is, with a stranger.

"THE COURT: Okay.

"MS. RIOS: Okay. And then goes to the car. Goes to confront two men with an injured arm.

"THE COURT: Does not find them.

"MS. RIOS: No. He finds his car.

"THE COURT: Is there any dispute about that?

"MS. RIOS: No. But he finds his car. His car is there. And my position is that he went to this area to arm himself and come back.

"THE COURT: Oh, to arm himself?

"MS. RIOS: Yes. Because he protects his family.

11

"THE COURT: Okay. Are you going to ask him whether he was armed or not?

"MS: RIOS: Yes, I am.

"THE COURT: Okay. Is he the one with the hatchet?

"MS. RIOS: Yes.

"THE COURT: Okay. [¶] . . . [¶] Let's bring the panel back in."

When proceedings resumed before the jury, Baze testified that when he went to the parking area he was not angry, only "curious" about what had passed between Hall and the two men. When he got there, "I made an observance of the parking lot area." Baze was asked, "And when you got to the parking lot where your car was, you got a hatchet from your car, didn't you?" He answered, "I did not." Baze testified that he then returned to the fishing area.

This was the prosecutor's redirect:

"Q. Did you go to the car and get a hatchet?

"A. No, sir.

"Q. Did you take a hatchet to the fishing spot when you ran into the defendant and the other individual where you were all fishing?

"A. Of course not.

"Q. And did you have a hatchet when you were on this trail?

"A. Of course not.

"Q. Who had the hatchet?

"A. The defendant, Mr. Brown."

When going through the jury instructions, the court came to CALCRIM No. 875 ("Assault With Deadly Weapon"), and asked "Should Paragraph 5 be in there?"[7] The following occurred thereafter:

"MR. HORVATH: I don't—listening to the testimony, I don't see where self-defense comes into play.

---

[7]The instruction enumerates what "the People must prove" to secure a conviction. The final element mentioned is "5. The defendant did not act (in self-defense/[or] in defense of someone else)."

"THE COURT: The People say no. What is the defense's position?

"MS. RIOS: Well, I am going to argue it in my closing.

"THE COURT: Okay. I guess that's—okay. I guess my question is, did you not ask for a self-defense instruction separately?

"MS. RIOS: That's right.

"THE COURT: But you would like me to—are you asking for it today?

"MS. RIOS: I was looking at it, and I was contemplating it. Quite frankly, I don't—I have to say that I don't know that there is enough evidence for the instruction.

"THE COURT: Okay.

"MS. RIOS: However, I believe that the People still have the burden of proving that this act was not—at least my client's reaction was not an act of self-defense.

"THE COURT: Okay.

"MS. RIOS: And I am going to argue it in my closing.

"THE COURT: All right. I am going to do the following: I am going to leave it in. Number 5. I am going to follow the law as I understand it that says the additional instruction of self-defense requires substantial evidence. I think I am going to agree with you that there is not substantial evidence of self-defense. But I will leave Paragraph 5 in there as you intend to argue it."

Defendant contends the judgment must be reversed by reason of "the trial court's failure to fully instruct the jury on the law of self-defense and defense of others." Defendant is correct that error occurred, but it was favorable to him and thus not prejudicial.

Contrary to the way the trial court read it, CALCRIM No. 875 does not identify the disproval of self-defense as an element of assault with a deadly weapon. The law is fully established on this. (See, e.g., *People v. Parks* (1971) 4 Cal.3d 955, 959 [text & fn. 1]; *People v. Wilson* (1967) 66 Cal.2d 749, 765; *People v. Smith* (1997) 57 Cal.App.4th 1470, 1483–1484.) On the contrary, the accompanying bench notes leave no doubt that what the court called "Paragraph 5" is not an element of the offense, but is to be given

only "if there is sufficient evidence of self-defense or defense of another." (CALCRIM No. 875 (2015 ed.), Bench Notes, pp. 588, 590.)

Here, there was no substantial evidence of self-defense. Such evidence would consist of evidence that (1) the hatchet was initially in Baze's possession and was first used by him in a menacing fashion, or (2) Baze otherwise qualified as the initial aggressor, or (3) that at some point Baze obtained possession of the hatchet and menaced defendant with it without justification. Such evidence was utterly absent here. [8] Thus, it was error to introduce the subject of self-defense into the instructions. (*People v. Rowland* (1992) 4 Cal.4th 238, 282 ["It is error for a court to give an 'abstract' instruction, i.e., 'one which is correct in law but irrelevant[.]' "]; *People v. Rollo* (1977) 20 Cal.3d 109, 122–123 [" 'It is error to give an instruction which correctly states a principle of law which has no application to the facts of the case.' "].) Nevertheless, the error benefited defendant for it allowed him to argue self-defense.

"Giving an instruction that is correct as to the law but irrelevant or inapplicable is error. [Citation.] Nonetheless, giving an irrelevant or inapplicable instruction is generally ' "only a technical error which does not constitute ground for reversal." ' "

---

[8]" 'Substantial evidence is "evidence sufficient 'to deserve consideration by the jury,' not 'whenever *any* evidence is presented, no matter how weak.' " ' " (*People v. Wilson* (2005) 36 Cal.4th 309, 331.) Defendant points to a number of circumstances preceding Baze's return from the parking area, but none comes close to putting the hatchet in Baze's hands. None establishes that Baze or Hall made an unprovoked attack. Even conceding that Hall may have struck the first actual blow with the fishing pole, it was undoubtedly prompted by defendant's brandishing of the far more lethal hatchet and Hall's desire to protect her loved ones. And even if Baze did land the first blow on Ross, it must be remembered that defendant was not an idle bystander, but was, in defense counsel's vivid characterization, swinging the hatchet "like [in] a horror movie." Baze, Hall, and Hall's brother were without question trying to leave the area, which is completely inconsistent with attempting to start a fight with an opponent whose location was unknown to them. It was defendant and Ross who, knowing that Hall, Baze, and Hall's brother had only one way back to their car, lay in wait for them with implements to inflict physical injury. That defendant told Deputy Collins that Ross had been hit in the mouth does not, as defendant now argues, "constitute substantial evidence that he [defendant] acted in defense of Ross," because neither defendant nor Ross ever connected that injury to anyone other than the "six men."

14

(*People v. Cross* (2008) 45 Cal.4th 58, 67.) Moreover, the jury was instructed with CALCRIM No. 200 that it should in effect ignore an instruction that was not supported by how the jury viewed the evidence.[9] It is presumed the jury followed this instruction. (*People v. Pearson* (2013) 56 Cal.4th 393, 414; *People v. Hovarter* (2008) 44 Cal.4th 983, 1005.)

" '[A] trial judge has the authority to refuse requested instructions on a defense theory for which there is no supporting evidence.' [Citation.] 'A party is not entitled to an instruction on a theory for which there is no supporting evidence.' [Citation.]" (*People v. Roldan* (2005) 35 Cal.4th 646, 715.) So, even if it is assumed that more substantive self-defense instructions should have been given, that omission would not qualify as prejudicial unless substantial evidence supported the defense. (See *People v. Mentch* (2008) 45 Cal.4th 274, 288 ["On appeal, we likewise ask only whether the requested instruction was supported by substantial evidence"]; *People v. Wilson*, *supra*, 36 Cal.4th 309, 331 ["[T]he trial court did not err in failing to give the [defense] instruction because defendant failed to present substantial evidence of the defense."].) As already shown, the predicate of substantial evidence is lacking. Thus, the failure to provide more complete instructions was harmless. (Cal. Const., art. VI, § 13.)

### There Was No improper Interference or Comment
### by the Trial Court

During her closing argument, defense counsel made reference to Baze getting a hatchet from his car. The court sustained the prosecutor's "facts not in evidence" objection, and "remind[ed]" the jury "there is no evidence before you that anyone other than the defendant had a hatchet." Defendant presents a lengthy argument that this was "an improper judicial comment on the evidence" that "undercut the defense . . . by telling the jury to ignore the defense theory of the case," thus violating his constitutional right to the effective assistance of counsel presenting closing argument. Again, no constitutional

---

[9]"Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume that just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

objection was made, so the point has not been preserved for appeal. If the merits were properly before us, we would reject them. The trial court did not preclude the defense from presenting its theory of self-defense, only from doing so on a premise that, as already shown, was utterly bereft of evidentiary support.

Beyond all that, the trial court gave closing instructions (CALCRIM No. 3550), included within which was this: "It is not my role to tell you what your verdict should be. Do not take anything I say or anything I did during this trial as an indication of what I think about the facts, the witnesses or what your verdict should be."

## DISPOSITION

The judgment of conviction is affirmed.

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Miller, J.

16