[No. C025971. Third Dist. July 29, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
FORREST RAY WRIGHT II, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*See footnote 3, *post*, page 706.

**COUNSEL**

Sandra Gillies, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer and Daniel E. Lungren, Attorneys General, David P. Druliner and George Williamson, Chief Assistant Attorneys General, Robert R. Anderson, Assistant Attorney General, Margaret Venturi and Alan Ashby, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BLEASE, Acting P. J.**—This case comes to us on remand from the Supreme Court for reconsideration in the light of *People v. Williams* (2001) 26 Cal.4th 779 [111 Cal.Rptr.2d 114, 29 P.3d 197] (hereafter *Williams*).

A jury convicted defendant of two counts of assault with a deadly weapon, a pickup truck, (Pen. Code,[1] § 245, subd. (a)(1); counts I and II).[2] He was sentenced to state prison for an aggregate term of three years.

The convictions arose out of two incidents in which the defendant drove his pickup truck close to persons with whom he had contentious relations. The defendant attempted to put his intent in issue with proposed instructions that embodied the claim he intended to frighten his adversaries and therefore his conduct amounted to no more than reckless driving.

The trial court rejected the defendant's instructions. It instructed the jury in the language of CALJIC No. 9.00 (1994 rev.), which defines the mental state for assault as the intentional commission of an "act that by its nature would probably and directly result in the application of physical force on another person . . . ." The jury sent several notes to the court that raised questions about the scienter required for assault. One asked: "If a person's intent is to intimidate, rather than cause bodily harm, but in the process the victim's safety is compromised, is it still considered assault?" Another note stated: "We need additional definition of simple assault." In answer the court reinstructed the jury in the language of CALJIC No. 9.00 (1994 rev.).

In an earlier opinion, also involving a vehicle, we held the mental state for assault is an intent to commit a battery. (*People v. Smith* (1997) 57 Cal.App.4th 1470, 1484 [67 Cal.Rptr.2d 604].) We concluded that language similar to CALJIC No. 9.00 (1994 rev.) misdefined the mental state for assault because it encompassed a negligence standard. We reversed the judgment because the defendant's theory of defense, that he did not intend to hit the victim with his vehicle, was withdrawn from jury consideration by the instruction. The Supreme Court denied review.

The decision in *Smith* was the basis of our original decision in this case. *Williams* is at odds with *Smith* because it adopts a negligence standard and on remand we consider the application of that standard to this case. In so

---

[1] A reference to a section, otherwise undesignated, is to the Penal Code.

[2] A mistrial on five other counts of assault with a deadly weapon or by means of force likely to produce great bodily injury (§ 245, subd. (a)(1); counts III through VII) was declared after the jury declared it was deadlocked on those counts.

doing we examine the conceptual route by which the Supreme Court got to that standard.

Historically, assault has been defined as an attempted battery. (*People v. Rocha* (1971) 3 Cal.3d 893, 899 [92 Cal.Rptr. 172, 479 P.2d 372]; *People v. Hood* (1969) 1 Cal.3d 444, 458 [82 Cal.Rptr. 618, 462 P.2d 370].) The harm addressed is a battery. *Williams* rejects the view that assault requires an intent to commit a battery. It holds that "assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*Williams, supra*, 26 Cal.4th at p. 790.) The test is objective. The actor "need not be subjectively aware of the risk that a battery might occur." (*Id.* at p. 788, fn. omitted.) This defines the mental state as a species of negligent conduct, a negligent assault. Where the negligent conduct involves the use of a deadly weapon, here a vehicle, the offense is assault with a deadly weapon. Thus, any operation of a vehicle by a person knowing facts that would lead a reasonable person to realize a battery will probably and directly result may be charged as an assault with a deadly weapon.

In the published portion of the opinion[3] we show the *Williams* interpretation of section 240 is based upon a mistake of fact, which produced an error of law. *Williams* asserts the definition of assault in section 240 was first enacted in 1872 and bases its statutory construction on that fact. "Because section 240 was enacted in 1872 and has not been amended, we must construe the Legislature's intent as of 1872." (*Williams, supra*, 26 Cal.4th at p. 785.)

In fact, the present definition of assault was enacted in 1850 as section 49 of the Crimes and Punishment Act. (Stats. 1850, ch. 99, § 49, p. 234.) It was codified without change in 1872 as section 240 of the new Penal Code. The Supreme Court cases interpreting the 1850 enactment, relied upon by the Code Commissioners in their report to the Legislature, state the 1850 language incorporates the common law definition of assault, which required an intent to inflict injury. This construction, consistent with *Smith*, would have required reversal of defendant's conviction in this case. It would *not*, for reasons we discuss, have required the characterization of section 240 as a specific intent crime.

Nonetheless, we are bound by *Williams*. We shall conclude the defendant was properly convicted of a negligent assault on the facts of the case.

[3]Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts VII through IX of the Discussion.

## FACTS

*COUNT I (The Dircksen Incident)*

On May 28, 1996, Patricia Dircksen, who worked for the Yreka Police Department as an administrative secretary, ran an errand outside the department. Returning to her office, she had to cross at the intersection of Oregon and Miner Streets. She was in the middle of the crosswalk when she heard a truck approaching. She looked up and saw defendant driving a white pickup truck around the corner at a "pretty good rate of speed." He was about 30 feet away. There was no stop sign. A woman and a boy were in the truck with defendant. Dircksen ran the rest of the way across the street fearing she would be struck otherwise. She was forced to jump out of the crosswalk and into the traffic lane. Defendant smirked as he passed within two to three feet of her.

In Dircksen's capacity as a police department employee, she had previously had encounters with defendant. Since 1994, the department had 59 "contacts" with defendant, "many" of which were negative. Dircksen believed defendant linked her with the negative contacts but did not specify any particular incident.

When Dircksen returned to the police station, she told Officer Frost what happened. In a written statement, she stated that she believed defendant was trying to intimidate her. Officer Frost testified at the preliminary hearing that Dircksen reported that she walked quickly, not ran, to the other side.

At trial, Dircksen testified that she believed defendant intended to hit her.

Defendant did not testify. Amanda Wright testified that she and Forrest Wright III, defendant's son, along with Kelly and Julie Wright, were riding with defendant in his 1966 Chevy pickup on the way to his shop. As defendant turned left off of Miner Street onto South Oregon Street, he slowed down from 20 miles per hour and stopped because there was a woman in the crosswalk. Defendant's truck was old and could not go more than 12 miles per hour around that corner because of a drain. After the woman crossed the street, defendant continued. The woman turned and looked at them "funny." Mrs. Wright did not recognize the woman at the time but later remembered that Dircksen had been present when the police searched the Wrights' house. Mrs. Wright claimed that Dircksen had not run across the street. Forrest Wright III confirmed Mrs. Wright's testimony.

*COUNT II (The McHenry Incident)*

Defendant and Ralph McHenry had known each other for about three years. They had once been friends. Both drove logging trucks and maintained them at shops located at 351 Oberlin Road in Yreka.

On June 9, 1996, McHenry had spent about five hours washing, waxing and working on his logging truck. He had had a few beers. Defendant got behind the wheel of a stock car and "spun a brodie"—driving rapidly in a circle—causing rocks to hit and dirt to settle on McHenry's clean truck. After defendant parked the stock car, he got in his pickup truck, which was towing a house trailer, and spun the wheels, kicking up more dust and gravel.

McHenry believed defendant had done so to intimidate him. McHenry approached Darrell Hall, the owner of the stock car, and yelled at him for allowing defendant to drive the car. McHenry then crossed Oberlin Road where defendant had parked the trailer and shook his finger at defendant. McHenry told defendant he was sick of "this shit." Defendant slapped McHenry's hand away and a shoving match ensued. Defendant grabbed a baseball bat from his truck and hit McHenry in the back of his arms several times. Mrs. Wright got involved and hit McHenry. As McHenry retreated, defendant threw a rock at McHenry. McHenry went to his brother's shop and armed himself with a baseball bat. McHenry wanted to communicate to defendant that he was not intimidated.

Defendant, Mrs. Wright and Forrest Wright III got into the pickup truck. As McHenry came out of the shop with the bat, he saw defendant driving the pickup truck very fast towards him. They made eye contact. Defendant's "eyeballs were really big and [his] teeth [were] clinched." The back wheels of the pickup truck were spinning. On the first pass, defendant missed McHenry by 10 feet. McHenry had stayed close to the building. On the second pass, McHenry threw the baseball bat at defendant's pickup truck. The back of the pickup truck slid towards McHenry. McHenry fell. He claimed he was struck on the inside of his knee. Defendant left the area and McHenry dusted himself off and went back to work on his logging truck.

McHenry claimed he had been in fear of great bodily harm. About an hour and one-half after the incident, McHenry went to the emergency room because his knee hurt.

Connie McHenry, Ralph McHenry's sister-in-law, had gathered up several children who were playing in the shop area and took them inside when defendant started to drive his pickup truck towards Ralph McHenry. She claimed defendant's truck had been going very fast, swinging from side to side and sliding when it lost traction. She called 911 because defendant's truck was out of control.

From a pay phone, defendant also called the police.

Yreka Police Officer William Bullington went to the shop area and observed track marks in the dirt near the building. The marks matched

defendant's pickup truck and showed he had accelerated. Officer Bullington interviewed defendant. Defendant recounted that McHenry crossed the street, grabbed him and punched him in the jaw. Bullington saw no injury on defendant's jaw. When McHenry shoved Mrs. Wright and Forrest Wright III, defendant grabbed the bat. Defendant explained he drove across the street to lock up his shop. As he entered the lot, McHenry stepped out into his path. Defendant admitted accelerating his truck to avoid McHenry, who was "coming at him" and went close to the building to make sure defendant's shop door was secure. Defendant was unaware that he had hit McHenry but told Officer Bullington that he wished he had struck and killed McHenry because it would have been McHenry's fault, but agreed it would not have been a good idea.

Defendant did not testify. Mrs. Wright claimed McHenry appeared to have been drinking because he was belligerent, angry and emotional and slurred his speech. When Mrs. Wright heard McHenry yelling at defendant about the dust, she and Forrest Wright III headed across the street. Mrs. Wright told McHenry to leave defendant alone. McHenry grabbed her arm and shook her. When Forrest Wright III told McHenry to leave defendant and Mrs. Wright alone, McHenry pushed him and claimed McHenry's son would "kick[] his butt." Defendant grabbed the bat and swung at McHenry and missed. McHenry headed to the shops yelling profanities and throwing rocks. Defendant, Mrs. Wright and Forrest Wright III got into the pickup and headed to the shop to secure it before they left. When they reached the parking lot, McHenry stepped out with a bat and swung at and hit the pickup truck. To avoid hitting McHenry, defendant swerved hard to the left causing it to slide. Defendant spun around and made sure his shop was locked and headed out of the parking lot. As they passed McHenry, McHenry swung the bat and broke the side mirror on the pickup truck. Forrest Wright III confirmed Mrs. Wright's testimony.

Darrell Hall, the owner of the stock car and a recycling shop at 351 Oberlin Road, saw defendant swing a bat at McHenry and miss. McHenry went to his brother's shop and obtained a baseball bat. Defendant drove across the street at a normal rate of speed. McHenry stepped into the middle of the parking lot waving the bat. When defendant got within a few feet of McHenry, defendant speeded up and turned the truck so the back end went into a slide, kicking up dust. One of McHenry's swings with the bat broke the pickup truck's side mirror. When defendant made the second pass, Hall went inside. Hall did not see the truck hit McHenry but did see McHenry fall.

### The Jury's Questions

At 5:12 p.m. on January 31, 1997, the jury retired to the jury room to deliberate. Shortly thereafter, the jury asked, "If a person's intent is to

intimidate, rather than cause bodily harm, but in the process the victim's safety is compromised, is it still considered assault?"

At 5:25 p.m., the court responded, "Please refer to [CALJIC Nos.] 3.30, 9.00 and Special Instruction [No.] 10 as well as all the instructions as a whole."[4]

At 8:04 p.m., the jury sent a note which stated, "We need additional definition of simple assault."

At 8:08 p.m., the jury sent another note asking, "Does holding a gun to someone's head and threatening them with bodily harm constitute assault (with deadly weapon) without determining whether or not the assailant was only bluffing or intending to intimidate?"

At 8:19 p.m., the court responded to the two notes. With respect to the first note, the court stated: "I can't really give you any more definition than I already—I will reread the definition, which is instruction number 9.00." After the court reread CALJIC No. 9.00, the court responded to the second note, "First of all, I want to make it clear that there is no allegation that [defendant] threatened anyone with a gun. I am sure everyone is clear on that. To use that as an example, basically, the answer is, yes. Does holding a gun to someone's head and threatening them with bodily harm constitute assault with deadly weapon? Yes. [¶] The added phrase, 'without determining whether or not the assailant was only bluffing or intending to intimidate.' Intimidation, bluffing, is really irrelevant. It is still an assault." Neither the prosecutor nor defense counsel had anything to add.

Additional facts relevant to defendant's contentions will be recounted in the discussion.

DISCUSSION

I

*The Crime of Negligent Assault*

The defendant was convicted of assault with a deadly weapon, the weapon being a truck. The jury was given two instructions on assault. It was

---

[4]The trial court instructed the jury in the language of CALJIC No. 3.30 as follows: "In the crimes charged there must exist a union or joint operation of act or conduct in general criminal intent. To constitute general criminal intent it is not necessary that there should exist an intent to violate the law. When a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent, even though he may not know that his act or conduct is unlawful."

The court also instructed the jury in the language of CALJIC No. 9.00. (See fn. 5, *post.*)

instructed in the language of section 240 that "[a]n assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." It was also instructed in the language of CALJIC No. 9.00 (1994 rev.), as in *Williams*, that, to constitute an assault, it must be proved "a person willfully and unlawfully committed *an act that by its nature would probably and directly result* in the application of physical force on another person. . . . 'Willfully' means that the person committing the act did so intentionally."[5] (Italics added.)[6]

The italicized language is essentially the same as that at issue in *People v. Smith, supra,* 57 Cal.App.4th 1470. In *Smith* the defendant drove his vehicle through a sheriff's blockade, striking, but not injuring, an officer in the lower leg. The officer testified he told defendant to wait. The defendant claimed he was waved through the blockade by the police. The jury convicted the defendant of assault with a deadly weapon.

We reversed the judgment on the view "[t]he natural and probable consequence of an intended act is a negligence standard" which precluded the jury from considering defendant's claim he did not intend to hit the officer. (*People v. Smith, supra,* 57 Cal.App.4th at p. 1488.)[7] We held the mental state for assault is an intent to commit a battery. (*Smith,* at p. 1484.)

*Smith* was the basis of our original opinion in this case. *Williams* rejects *Smith,* asserting that "assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against

---

[5]The instruction provided in pertinent part: "Every person who commits an assault upon another person is guilty of a crime. In order to prove such crime, each of the following elements must be proved: One, a person willfully and unlawfully committed an act that by its nature would probably and directly result in the application of physical force on another person. And, two, at the time the act was committed, such person had the present ability to apply physical force to the person of another. [¶] 'Willfully' means that the person committing the act did so intentionally."

[6]CALJIC No. 9.00 was amended following *Williams* to conform to its formulation of the required mental state for assault pursuant to section 240. (See now CALJIC No. 9.00 (2002 rev.).)

[7]"The 'natural and probable consequence' of an intended act cannot be equated with the required intention for assault with a deadly weapon, i.e., an intended forcible and unlawful touching as a desired consequence or one that is known to be substantially certain to result. The natural and probable consequence of an intended act is a negligence standard—and this differs in two respects. First, it is objective; it does not proceed from the correct coign of vantage, what the defendant knew about the consequences of moving the vehicle forward. Second, it embodies an incorrect measure of the risk of injury; it looks to reasonably foreseeable consequences, not to consequences which are desired or which are substantially certain to result from the defendant's conduct." (*People v. Smith, supra,* 57 Cal.App.4th at p. 1488.) *Smith* held the mental state for an assault is "an intent to commit a battery . . . ." (*Id.* at p. 1484.)

another." (*Williams, supra,* 26 Cal.4th at pp. 787-788, 790.) "In other words, a defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct. He may not be convicted based on facts he did not know but should have known. He, however, need not be subjectively aware of the risk that a battery might occur." (*Id.* at p. 788, fn. omitted.)

By construing assault as intentional conduct involving an objective risk of harm, *Williams* defines the mental state by a negligence standard. *Williams* acknowledges the objective test of probable consequences "arguably implies an objective mental state consistent with a negligence standard. (See *Smith, supra,* 57 Cal.App.4th at p. 1480.)" (*Williams, supra,* 26 Cal.4th at p. 787.) However, it further asserts that "mere recklessness or criminal negligence is still not enough [citation] because a jury cannot find a defendant guilty of assault based on facts he should have known but did not know (see *Walker v. Superior Court* (1988) 47 Cal.3d 112, 136 [253 Cal.Rptr. 1, 763 P.2d 852] ['criminal negligence must be evaluated objectively'].)" (*Id.* at p. 788, fn. omitted.)

This statement apparently is based on the view that *Walker* was referring to the conduct and not the risk posed by the conduct. But *Walker,* relying on *People v. Watson* (1981) 30 Cal.3d 290, 296-297 [179 Cal.Rptr. 43, 637 P.2d 279] and *People v. Penny* (1955) 44 Cal.2d 861, 880 [285 P.2d 926], measures criminal negligence by "whether 'a reasonable person in defendant's position would have been aware of the *risk* involved . . . .' " (*People v. Walker, supra,* 47 Cal.3d at pp. 136-137, italics added; see also *Williams v. Garcetti* (1993) 5 Cal.4th 561, 574 [20 Cal.Rptr.2d 341, 853 P.2d 507].) That is precisely the test that *Williams* would apply to an assault.

The mental states of intention, recklessness and negligence are principally distinguished by the relationship of the act made criminal to the harm addressed by the criminal statute. An intentional mental state requires that the defendant intend to commit the harm to which the criminal statute is addressed. Recklessness and negligence differ in that, while the harm is not intended, each involves a risk that the harm from a criminal act is a likely consequence of the act. Recklessness requires a subjective awareness of the risk of harm. (See, e.g., *People v. Watson, supra,* 30 Cal.3d at p. 296.) Negligence requires an objective view of the risk of harm. "The facts must be such that the . . . consequence of the negligent act could reasonably have been foreseen." (*People v. Penny, supra,* 44 Cal.2d at p. 880.) In either case the criminal act may be intended but not the harm. (See *In re Stonewall F.* (1989) 208 Cal.App.3d 1054, 1061, fn. 6 [256 Cal.Rptr. 578].)

We next examine the historic and conceptual route by which the Supreme Court got to a negligence measure of assault.

## II

*Williams Is Based on a Mistake of Fact; Section 240 Was Enacted in 1850, Not 1872*

As noted, section 240 defines assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." *Williams*'s interpretation of this language is predicated on the view that "courts must determine the drafter's intent at the time of enactment" and the belief that section 240 is "unchanged since its *initial* enactment in 1872 . . . ." (*Williams, supra,* 26 Cal.4th at pp. 785, 784, italics added.) "Because section 240 was enacted in 1872 and has not been amended, we must construe the Legislature's intent as of 1872." (*Id.* at p. 785.)[8]

*Williams* locates the mental state for assault in the word "attempt" as found in section 240. In defining that term the court looked to the definition of "attempt" set forth in an 1872 legal dictionary, 1 Bouvier's Law Dictionary (1872) page 166. (*Williams, supra,* 26 Cal.4th at pp. 785-786.) *Williams* rejects a claimed second definition—"an intent to do a thing combined with an act which falls short of the thing intended"—because it "appears to describe the traditional formulation of criminal attempt later codified in section 21a, which requires a specific intent." (*Id.* at p. 786.) *Williams* reasons the Legislature must have rejected this measure because assault is not a specific intent crime. The difficulty here, as we later show, is that attempt, as used in assault, differs from assault in the law of general criminal attempts on the basis of the proximity of the act to a battery and that element is reflected in the statutory language defining assault, "coupled with a present ability . . . ."

Having rejected the claimed second definition, *Williams* presumed that the Legislature adopted what it views as a third definition, which it said "the Legislature, consistent with the historical understanding of assault, presumably intended to adopt" (*Williams, supra,* 26 Cal.4th at p. 787.); an attempt requires " 'an intent to commit some act which would be indictable, if done, either from its own character or that of its natural and probable consequences.' " (*Id.* at p. 786.) From this *Williams* concludes: *"Based on* [this] *1872 definition of attempt,* a defendant is only guilty of assault if he intends to commit an act 'which would be indictable [as a battery], if done, either from its own character or that of its natural and probable consequences.' " (*Id.* at p. 787, italics added.)

---

[8]Notwithstanding that *Williams* places the locus of legislative intent at the date of enactment, it also states: "Over the decades, we have struggled to fit this 1872 definition of assault into our constantly evolving framework of criminal mental states." (*Williams, supra,* 26 Cal.4th at p. 784.) How a meaning that is fixed at its birth can evolve is not explained.

The immediate difficulty with the court's interpretation of attempt is that it is based on the belief that section 240 was "initial[ly]" enacted in 1872. In fact it was not. As recognized in earlier Supreme Court cases (see, e.g., *In re James M.* (1973) 9 Cal.3d 517, 522 [108 Cal.Rptr. 89, 510 P.2d 33]; *People v. Colantuono* (1994) 7 Cal.4th 206, 219 [26 Cal.Rptr.2d 908, 865 P.2d 704]) and noted in annotations to the codes,[9] the language of section 240 derives from the identical language of section 49 of the Crimes and Punishment Act of 1850. (Stats. 1850, ch. 99, § 49, p. 234.)[10] "Since its first session, our Legislature has defined criminal assault as an attempt to commit a battery by one *having present ability* to do so *(Stats. 1850, ch. 99, § 49, p. 234; now Penal Code § 240) . . . ." (In re James M., supra,* 9 Cal.3d at p. 522, italics in original and added.)

Thus, in "enacting" section 240, the 1872 Legislature did no more than codify the language of the 1850 enactment by placing it in a section of the new Penal Code.[11] Consistent with its view that a court should "ascertain the Legislature's intent at the date of enactment," the *Williams* court should have looked to the intent of the 1850 Legislature in enacting section 49 of the Crimes and Punishment Act. *(Williams, supra,* 26 Cal.4th at p. 785.)

The Supreme Court did so in two opinions delivered within a few years of the enactment of section 49. *(People v. McMakin* (1858) 8 Cal. 547; *People v. Yslas* (1865) 27 Cal. 630.) In both cases the court construed assault as requiring an intent to commit an injury.

In *McMakin* the court said: "An assault is defined by our statute to be an 'unlawful attempt coupled with a present ability, to commit a violent injury upon the person of another.' . . . [¶] The intention to commit the act is necessary to constitute the offence in all cases. . . ." *(People v. McMakin, supra,* 8 Cal. at p. 548, citations omitted.) The act referred to necessarily is the violent injury. Thus, the court said: "*The intention must be to commit a present and not a future injury,* upon a different occasion. The acts done must be in preparation for an immediate injury." *(Ibid.,* italics added.)

*People v. Yslas* construed the 1850 statute as incorporating the common law definition of assault. "The common law definition of an assault is

---

[9](Historical and Statutory Notes, 48 West's Ann. Pen. Code (1999 ed.) foll. § 240, p. 94; Prior Law, Deering's Ann. Pen. Code (1985 ed.) foll. § 240, p. 284.)

[10]"An assault is an unlawful attempt, coupled with a present ability to commit a violent injury on the person of another." (Stats. 1850, ch. 99, § 49, p. 234.) The statute was amended in 1856 to add a penalty but was otherwise unchanged, save for the addition of the comma after "ability" to fully set off the subordinate clause. (Stats. 1856, ch. 139, § 5, p. 220.) The penalty was moved to another section in 1872. (§ 241.)

[11]Section 240. "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."

substantially the same as that found in the statute. (1 [Russell on Crimes (1853)] 748;[12] 1 [Wharton,] Sec. 1241.[13])"[14] (*People v. Islas, supra,* 27 Cal. at p. 633.) The court reads the common law as: "In order to constitute an assault there must be something more than a mere menace. There must be violence begun to be executed. But where there is *a clear intent to commit violence* accompanied by acts which if not interrupted will be followed by personal injury, the violence is commenced and the assault is complete." (*Ibid.*, italics added.)

*McMakin* and *Yslas* have long been recognized by the Supreme Court as authority for the proposition that assault requires an intent to commit an injury. (See, e.g., *People v. Colantuono, supra,* 7 Cal.4th at p. 219.) After citing an example from *McMakin*,[15] *Colantuono* concludes, quoting from *People v. Hood*: "Hence, the necessary mental state [for assault] is 'an intent merely to do a violent act.' (*Hood, supra,* 1 Cal.3d at p. 458.)" (*Colantuono,* at p. 219.) The Supreme Court on many occasions has said, as did *Hood,* that a criminal assault requires an intent to commit a battery or injury. (See, e.g., *People v. Coffey* (1967) 67 Cal.2d 204, 221-222 [60 Cal.Rptr. 457, 430 P.2d 15] [" 'One could not very well "attempt" or try to "commit" an injury on the person of another if he had no intent to cause any injury to such other person.' "].) Even *People v. Rocha, supra,* 3 Cal.3d at page 900, upon which *Williams* relies, says "a battery must be contemplated," and concludes "there was ample evidence from which the jury could infer that the defendant had the intent to commit a battery upon the victim . . . ."

*Williams* misreads and misreports *Rocha. Williams* quotes from *People v. Rocha, supra,* 3 Cal.3d at page 899, that assault does not require the specific " 'intent to cause any particular injury [citation], to severely injure another, or to injure in the sense of inflicting bodily harm . . . . [Fns. omitted.].' "

---

[12]1 Russell on Crimes states: "An assault is an attempt or offer, with force and violence, to do a corporal hurt to another; as by striking at another with a stick or other weapon . . . ." (At p. 748.)

[13]1 Wharton, American Criminal Law (1861) chapter 8, section 1241, page 663, states: "§ 1241. An assault is an intentional attempt, by violence, to do an injury to another. The attempt must be intentional; for, if it can be collected, notwithstanding appearances to the contrary, *that there is not a present purpose to do injury,* there is no assault." (Italics added, fn. omitted.)

1 Wharton, American Criminal Law, *supra,* section 1242, in relevant part, also states: " 'It must also', to adopt the language of the late Judge Gaston, 'amount to an attempt; for a purpose to commit violence, however fully indicated, if not accompanied by an effort to carry it into immediate execution, falls short of an actual assault.' " (*Ibid.*)

[14](See also *People v. Wells* (1904) 145 Cal. 138 140 [78 P. 470] [§ 240 "is substantially the old or common-law definition of an assault"].)

[15]"As this court explained more than a century ago, 'Holding up a fist in a menacing manner, drawing a sword, or bayonet, presenting a gun at a person who is within its range, have been held to constitute an assault.' " (*People v. McMakin, supra,* 7 Cal.4th at p. 219.)

(*Williams, supra*, 26 Cal.4th at p. 784.) It juxtaposes this sentence with the sentence from *Rocha* that assault requires " 'the general intent to willfully commit an act the direct, natural and probable consequences of which if successfully completed would be the injury to another.' (*Ibid.*)" From this *Williams* derives support for its view the mental state for assault requires a test of probable consequences.

The difficulty with this view is that *Williams* has reversed the order of the sentences. This is important because the first sentence quoted above explains the meaning of the second sentence. A footnote to that sentence, which *Williams* omits, says: "*A battery must be contemplated*, but only an 'injury' as that term is used with respect to a battery need be intended. 'It has long been established, both in tort and criminal law, that "the least touching" may constitute battery.' " (*People v. Rocha, supra*, 3 Cal.3d at p. 899, fn. 12, italics added; see *People v. Smith, supra*, 57 Cal.App.4th at pp. 1482-1484.)

*McMakin* and *Yslas*, among other decisions, were relied upon by the California Code Commission in explaining the meaning of section 240 to the Legislature.

"An assault has also been said to be an intentional attempt, by violence, to do an injury to the person of another. It must be *intentional*. If there is no present purpose to do an injury, there is no assault. There must also be an *attempt*. A purpose not accompanied by an effort to carry into immediate execution falls short of an assault. Thus no words can amount to an assault. But rushing towards another with menacing gestures, and with *a purpose to strike*, is an assault, though the accused is prevented from striking before he comes near enough to do so—State vs. Davis, 1 Ired. N.C., p. 121; *People vs. Yslas*, [*supra*,] 27 Cal., p. 630. But mere threatening gestures unaccompanied by such a *purpose*, although sufficient to cause a man of ordinary firmness to believe he was about to be struck, does not constitute an assault. Thus, when the defendant shook his whip at the prosecutor, saying, at the same time: 'If you were not an old man I would knock you down.' *Held*: no assault, unless the jury should be satisfied that there was a present purpose to strike.—State vs. Crow, 1 Ired. N.C., p. 375. To the same effect is Commonwealth vs. Eyre, 1 Serg. & R., p. 347. So, where an Embassador exhibited a painting in the window of his house which gave offense to the crowd without, and defendant, among the crowd, fired a pistol at the painting at the very time when the Embassador and his servants were in the window to remove it, but did not intend to hurt any of them, and in fact did not. *Held*, that there being no intent to injure the person there could be no conviction for an assault.—U.S. vs. Hand, 2 Wash. C.C., p. 435; *People v. McMakin*, [*supra*,] 8 Cal., p. 547." (Code commrs., note foll. Ann. Pen. Code, § 240 (1st ed. 1872, Haymond & Burch, commrs. annotators) pp. 104-105, italics in original.)

*Williams* acknowledges that "[i]n determining which meaning of 'attempt' [as derived from 1 Bouvier's Law Dict.] the Legislature intended to use in section 240, we must look to the historical 'common law definition' of assault," citing to a "Code commrs. note" (found at the same pages of the report cited above.) (*Williams, supra,* 26 Cal.4th at p. 786.) The court says that "parts of the code commissioner's comment to section 240 suggest that assault requires a specific intent to injure." (*Id.* at p. 787, fn. 2.)[16]

*Williams* rejects the commissioner's construction, set forth above and in the dissenting opinion of Justice Kennard (*Williams, supra,* 26 Cal.4th at pp. 793-794), saying: "We do not . . . find these parts of the comment compelling in light of the historic conception of assault and the Legislature's decision to make assault a statutorily distinct crime from criminal attempt. (See *ante,* at pp. 785-786.)" (26 Cal.4th at p. 787, fn. 2.)

The reference is to a discussion distinguishing between attempt in the law of assault and attempt in the law of criminal attempt, a subject we shortly will examine.

## III

### *Williams Misreads Bouvier's Law Dictionary*

There are two significant problems with the court's definition of attempt, which it ascribes to 1 Bouvier's Law Dictionary, *supra.*[17]

### A. *Bouvier's Definition of Assault*

First, *Williams* does not consider the most relevant definition in Bouvier, the definition of assault itself. It provides:

"Assault. An unlawful offer or attempt with force or violence to do a corporal hurt to another. [¶] Force unlawfully directed or applied to the person of another under such circumstances as to cause a well-founded apprehension of immediate peril."

---

[16]The word "specific" does not appear in the commissioners' comment. It suggests that assault is a specific intent crime. However, as we explain below, assault, although historically defined as requiring an intent to injure, is not a *specific intent crime* within the framework of general and specific intent.

[17]*Williams* asserts: "In 1872, attempt apparently had three possible definitions: (1) '[a]n endeavor to accomplish a crime carried beyond mere preparation, but falling short of execution of the ultimate design in any part of it' (1 Bouvier's Law Dict. (1872) p. 166); '[a]n intent to do a thing combined with an act which falls short of the thing intended' (*ibid.*); and (3) 'an intent to commit some act which would be indictable, if done, either from its own character or that of its natural and probable consequences' (*ibid.*)." (*Williams, supra,* 26 Cal.4th at pp. 785-786.)

*"Aggravated assault* is one committed with the intention of committing some additional crime. *Simple assault* is one committed with no intention to do any other injury." (1 Bouvier Law Dict., *supra,* at p. 152, italics in original.)

This definition does not contain the natural and probable consequences language at issue in the "attempt" definition. It distinguishes between an aggravated and a simple assault by the nature of the required intention. An aggravated assault is one committed with the intention of committing some additional crime. By contrast, a "[s]imple assault is one committed with no intention to do any other injury." We read this to mean "with no intention to do any other injury" than the one addressed by a simple assault, to wit a "corporal hurt."

Since the mental state for assault is contained in Bouvier's definition of assault, it would be odd to find another and contradictory meaning in the definition of attempt. There is none. Rather, a full reading of the Bouvier definition shows it reflects the traditional definition of an attempt.

### B.  *Bouvier's Definition of Attempt*

The definition of attempt in Bouvier begins with the following language, which expresses the ordinary definition of a criminal attempt, an attempt to commit a crime, carried beyond mere preparation, the intent being to accomplish the crime. (See now § 21a.)

"Attempt. [¶] In Criminal Law. An endeavor to accomplish a crime carried beyond mere preparation, but falling short of execution of the ultimate design in any part of it. [Citation.] [¶] An intent to do a thing combined with an act which falls short of the thing intended." (1 Bouvier's Law Dict., *supra,* at p. 166.)

The purported third definition, upon which *Williams* relies (*Williams, supra,* 26 Cal.4th at p. 786), then reads as follows: "To constitute an attempt, there must be an intent to commit some act which would be indictable, if done, either from its own character or that of its natural and probable consequences, . . ." (1 Bouvier's Law Dict., *supra,* at p. 166.)

This is not a complete definition. In Bouvier there is a comma after "consequences." The comma is followed by citations, then a semicolon and the following qualification: *"an act apparently adapted to produce the result intended . . . ."* (Italics added.) The "act" referred to is that which precedes the qualification, namely "some act which would be indictable, if done,

either from its own character or that of its natural and probable consequences . . . ." Thus, the provision actually reads: "To constitute an attempt, there must be an intent to commit some act . . . apparently adapted to produce the result intended . . . ." The "result intended" most certainly refers to what *Williams* claims is the second of the definitions in Bouvier, "[a]n intent to do a thing combined with an act which falls short of the thing intended."

Thus, the natural and probable consequences language, upon which *Williams* relies, has nothing to do with the mental state required for an assault. Read in context it has to do with the causal relationship of the act that constitutes the attempt to the crime intended.

The faulty definition of attempt from Bouvier is the springboard from which *Williams* launches its analysis of the mental state required for an assault.

## IV

### *The Meaning of Attempt In the Law of Assault*

*Williams* derives the mental state for assault from the *proximity* of the assaultive act to the completion of the offense, i.e., to a battery, a "consummated assault," and distinguishes that *causal* relationship from the causal relationship of a general criminal attempt to the harm intended, the crime attempted. *Williams* says: "[C]riminal attempt and assault require different mental states. Because the act constituting a criminal attempt 'need not be the last proximate or ultimate step toward commission of the substantive crime,' criminal attempt has always required 'a specific intent to commit the crime.' [Citation.] In contrast, the crime of assault has always focused on the nature of the act and not on the perpetrator's specific intent. An assault occurs whenever ' "[t]he next movement would, *at least to all appearance*, complete the battery." ' [Citation.]" (*Williams, supra,* 26 Cal.4th at p. 786, original italics.)

"Thus, assault 'lies on a definitional . . . *continuum of conduct* that describes its essential relation to battery: An assault is an incipient or inchoate battery: a battery is a consummated assault.' [Citation.] As a result, a specific intent to injure is not an element of assault because the assaultive act, by its nature, subsumes such an intent."[18] (*Williams, supra,* 26 Cal.4th at 786.) *Williams* assumes that unless there is a specific intent to commit a

---

[18]The last sentence repeats the point made in *People v. Colantuono*, that "[i]f one commits an act that by its nature will likely result in physical force on another, the particular intention of committing a battery is thereby subsumed." (*People v. Colantuono, supra,* 7 Cal.4th at p.

battery there can be no general intent to commit a battery and the distinction turns on the proximity of the assaultive act to a battery.

The difficulty with this reasoning is the proximity of the assaultive act to a battery is a *causal* relationship, which is expressed in the separate requirement in section 240 that the attempt must be "coupled with a present ability" to commit a violent injury. In other words, the proximity required for an assault is not found in the meaning of attempt but in a separate element of the assault definition.

Accordingly, the term "attempt" in assault bears the same mental state as "attempt" in the law of criminal attempts, the two attempts being distinguished by the separate requirement of a "present ability." An attempt ordinarily connotes an intent to accomplish that which is attempted. (See *People v. Hood, supra,* 1 Cal.3d at p. 457 [The "word 'attempt' in Penal Code section 240 strongly suggests goal-directed, intentional behavior."].) In this sense both a criminal attempt and an assault require an intent to commit that which is attempted.[19] "[T]he definitions of both specific intent and general intent cover the requisite intent to commit a battery . . . ." (*Hood, supra,* 1 Cal.3d at p. 458.)

217.) In *Colantuono* this view was derived from Perkins on Criminal Law (2d ed. 1969) section 2, pages 118-119, which refers to the wholly different notion of an oblique or ascribed intent, one characterized by the certainty, not the likelihood, that the harm will be caused by the application of physical force. (See *Colantuono, supra,* at pp. 217-218; cf. *People v. Smith, supra,* 57 Cal.App.4th at pp. 1484-1487.)

If the paragraph does not refer to an oblique intention but to an element of the offense, it would constitute a conclusive presumption without the necessity that the jury determine the element. As *People v. Hood* cautioned: " 'The fact that one element of a crime may be inferred from proof of another does not decrease the number of elements.' In the crimes of simple assault and assault with a deadly weapon, the jury may infer from defendant's conduct that he entertained the necessary intent to commit an injury. *Such an inference does not affect the nature of that intent* or determine what significance should be accorded to evidence of intoxication." (*People v. Hood, supra,* 1 Cal.3d at p. 458, fn. 7, italics added.) Of course, under a substantial evidence review the "intent may then be implied from the doing of the unlawful act." (*People v. McCoy* (1944) 25 Cal.2d 177, 194-195 [153 P.2d 315].) A "court's duty [is] to see to it that the jury are adequately informed on the law governing all elements of the case submitted to them to an extent necessary to enable them to perform their function in conformity with the applicable law." (*People v. Sanchez* (1950) 35 Cal.2d 522, 528 [219 P.2d 9].)

In any case, subsuming an intent to injure makes sense only if such an intent is an element of the offense, and *Williams* holds that it is not.

[19]It is theoretically possible to distinguish an attempted battery under the law of criminal attempt and an attempted battery requiring, as in section 240, a present ability to commit the battery. In such a case, "two grades or degrees of attempt to commit a battery should be recognized—one coming very close to the intended victim and denominated an 'assault,' the other more remote and known only as an 'attempt to commit a battery.' " (Perkins & Boyce, Criminal Law (3d ed. 1982) § 2, p. 172.)

However, under California law there is no such offense as an attempted battery without present ability. "Since its first session, our Legislature has defined criminal assault as an

*Williams* fosters the anomaly that an intent to commit a battery is required for attempted battery within the general law of criminal attempts,[20] and for a consummated battery, but not for an inchoate battery. A consummated battery requires an intent to commit the battery.[21] However, "because '[a]n assault is a necessary element of battery . . . it is impossible to commit battery without assaulting the victim.' " (*People v. Ortega* (1998) 19 Cal.4th 686, 692 [80 Cal.Rptr.2d 489, 968 P.2d 48]; *People v. Colantuono, supra,* 7 Cal.4th at pp. 216-217.) Accordingly, the intent required for assault must be the same as that for battery, since their elements differ only in the causal relationship to the harm intended. This does not make assault a specific intent crime, as we next show.

## V

### *An Intent to Commit a Battery Does Not Make Assault a Specific Intent Crime*

*Williams* rejects the view that an assault requires an intent to commit a battery on the assumption that such an interpretation would make assault a specific intent crime.

---

attempt to commit a battery by one *having present ability* to do so . . . and no offense known as attempt to assault was recognized in California at the time that statutory definition of assault was adopted. Under the doctrine of manifested legislative intent, an omission from a penal provision evinces a legislative purpose not to punish the omitted act. Hence, there is a clear manifestation of legislative intent under this doctrine for an attempt to commit a battery without present ability to go unpunished." (*In re James M., supra,* 9 Cal.3d p. 522, fn. omitted, original italics.)

*James* footnotes the fact "[t]he predecessor to Penal Code section 664, which provides for the punishment of attempts to commit crime, was enacted in 1856. (Stats. 1856, ch. 110, § 8, p. 132.)" (*In re James M., supra,* 9 Cal.3d at p. 522, fn. 1.)

[20] There is no such crime under California law. (See fn. 18, *ante.*)

[21] "A battery is any willful and unlawful use of force or violence upon the person of another." (§ 242.) A willful use of force upon another is an intentional application of force. "[W]illfully" refers to "the intent with which an act is done" and implies "a purpose or willingness to commit the act . . . ." (§ 7, subd. 1.) Since the "act" condemned by the statute is the act of applying force, the mental state is perforce an intent to commit that act. (*Ashcraft v. King* (1991) 228 Cal.App.3d 604, 611 [278 Cal.Rptr. 900] ["A harmful contact, intentionally done is the essence of a battery."].)

A battery is a general intent crime for the reason set forth in *Hood* because "the definition of [the] crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence . . . ." (*People v. Hood, supra,* 1 Cal.3d at p. 457; see also *People v. Colantuono, supra,* 7 Cal.4th at p. 217; *People v. Lara* (1996) 44 Cal.App.4th 102 [51 Cal.Rptr.2d 402].)

*Williams* implicitly reasons that under the general law of criminal attempts an attempt requires a specific intent to commit a crime,[22] and, since a battery is a crime, an intent to commit a battery would constitute a specific intent crime contrary to the historic view that assault is a general intent crime.

The difficulty with this reasoning is that an intent to commit a battery does not make assault a specific intent crime. As *People v. Hood* points out, "Many cases have held that neither assault with a deadly weapon nor simple assault is a specific intent crime." (*People v. Hood, supra,* 1 Cal.3d at p. 452, and fn. 4, listing 30 cases.) The cases cited by *Hood* include cases that hold that assault requires an intent to injure or commit a battery, including the 1858 case of *People v. McMakin,* discussed *ante.*

Since *Williams* "reaffirm[s] that assault does not require a specific intent to injure the victim" (*Williams, supra,* 26 Cal.4th p. 788.), an issue long settled,[23] the question arises—what does specific intent have to do with the mental state for assault. *Williams* answers that it concerns the admissibility of evidence of intoxication. *Williams* refers to "the amendment of section 22 in 1982 . . . . to make clear that voluntary intoxication could only negate specific intent and not general criminal intent. [Citations.] In making this amendment, the Legislature intended to preserve existing law, including *Hood,* which held that involuntary intoxication is not a defense to assault." (26 Cal.4th at p. 789.)

But *Hood* makes clear that applying section 22 to assault is not in conflict with the view that assault requires a mental state of intent to commit a battery. "[W]hatever reality the distinction between specific and general intent may have in other contexts, the difference is chimerical in the case of assault with a deadly weapon or simple assault . . . [s]ince the definitions of both specific intent and general intent cover the requisite intent to commit a battery . . . ." (*People v. Hood, supra,* 1 Cal.3d at p. 458.)

*Hood* concerned the admissibility of evidence of intoxication under section 22[24] to defease the mental state required for assault and assault with a deadly weapon, which it describes as an "intent to commit a battery." (*People v. Hood, supra,* 1 Cal.3d at p. 458.)

---

[22]Section 21a provides: "An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission."

[23](See, e.g., *People v. Marseiler* (1886) 70 Cal. 98 [11 P. 503] [assault with deadly weapon does not require proof of specific intent; evidence of intoxication may be excluded]; *People v. Franklin* (1886) 70 Cal. 641 [11 P. 797] [evidence of intoxication not admissible regarding assault with a deadly weapon.].)

[24]Section 22 sets forth the circumstances in which evidence of voluntary intoxication is admissible, a question for the court. It does not set forth the measure of the scienter required for any offense and therefore cannot be the ground for instructing the jury. The judicial

*Hood* says "[t]he distinction between specific and general intent crimes evolved as a judicial response to the problem of the intoxicated offender." (*People v. Hood, supra,* 1 Cal.3d at p. 455.) "[T]he definitions of both specific intent and general intent cover the requisite intent to commit a battery . . . ." (*Id.* at p. 458.) "Accordingly, [said *Hood*], on retrial the court should not instruct the jury to consider evidence of defendant's intoxication in determining whether he committed assault with a deadly weapon . . . or any of the lesser assaults included therein." (*Id.* at pp. 458-459.)

*Hood* discusses in detail the conceptual underpinnings of the specific/general intent distinction. "Specific and general intent have been notoriously difficult terms to define and apply, and a number of text writers recommend that they be abandoned altogether. (Hall, General Principles of Criminal Law [(2d ed. 1960)] p. 142; Williams, Criminal Law—The General Part (2d ed. 1961) § 21, p. 49.) Too often the characterization of a particular crime as one of specific or general intent is determined solely by the presence or absence of words describing psychological phenomena—'intent' or 'malice,' for example—in the statutory language defining the crime. When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent. There is no real difference, however, only a linguistic one, between an intent to do an act already performed and an intent to do that same act in the future." (*People v. Hood, supra,* 1 Cal.3d at pp. 456-457.)

*Hood* has never been questioned on this point. *Hood*'s formulation of the distinction between a specific and a general intent crime has been reaffirmed in many cases and has become accepted as the "standard formulation . . . ." (*People v. Rathert* (2000) 24 Cal.4th 200, 205 [99 Cal.Rptr.2d 779, 6 P.3d 700].) Indeed, *Williams* quotes approvingly *People v. Hering* (1999) 20 Cal.4th 440, 445 [84 Cal.Rptr.2d 839, 976 P.2d 210] and *People v. Rathert, supra,* 24 Cal.4th 200, 205, both of which rely on *Hood.* "Thus [says *Williams*], in *People v. Hering,* . . . we cautioned against the rote application of the general/specific intent framework. We have also suggested that '[s]uch classification of offenses is necessary "only when the court must determine whether a defense of voluntary intoxication or mental disease, defect, or disorder is available . . . ."' " (*Williams, supra,* 26 Cal.4th at

---

function is to determine whether an offense comes within its provisions. If so evidence of intoxication is admissible. If not it is excluded. There is no need to tell the jury anything except what evidence is admissible.

p. 785, citing to *People v. Rathert, supra,* at p. 205.) *Williams,* following *Hood,* reaffirms that "juries should not 'consider evidence of defendant's intoxication in determining whether he committed assault' (*Hood, supra,* 1 Cal.3d at p. 459.)" (*Williams, supra,* 26 Cal.4th at p. 788.)

The question then arises, why should the jury be given an instruction on general intent as a measure of an element of an offense when the purpose of the classification is to determine the admissibility of evidence, a judicial function, and that determination was long ago made for assault. *Williams* provides no answer.

## VI

### *Applying Williams Defendant Was Properly Convicted on the Facts of This Case*

In *Williams,* the court considered the instruction given in this case and found it potentially ambiguous for the reason "a jury could conceivably convict a defendant for assault even if he did not actually know the facts sufficient to establish that his act by its nature would probably and directly result in a battery." (*Williams, supra,* 26 Cal.4th at p. 790.) Nonetheless, the court said that "any instructional error is largely technical and is unlikely to affect the outcome of most assault cases, because a defendant's knowledge of the relevant factual circumstances is rarely in dispute." (*Ibid.*)

In *Williams,* the defendant admitted he fired a warning shot from a shotgun at a truck behind which was crouched the alleged victim, King, even though he knew King was in the near vicinity. The shot hit the rear tire of the truck, but not King. *Williams* affirmed the conviction of assault with a deadly weapon, saying: "In light of these admissions, defendant undoubtedly knew those facts establishing that his act by its nature would directly, naturally and probably result in a battery." (*Williams, supra,* 26 Cal.4th at p. 790.)

In this case, because former CALJIC No. 9.00 (1994 rev.) did not require the jury to consider whether the defendant intended a forcible and unlawful touching as a desired consequence or a consequence known to be substantially certain to result in such a touching, the jury was permitted to convict defendant of assault if it determined, under an objective view of the facts, that an application of physical force on another person was reasonably foreseeable.

Although the instruction given the jury is ambiguous for the reason set forth in *Williams,* that it does not affirmatively require that Wright had actual

knowledge of the fact his conduct would probably and directly result in the application of physical force to Dircksen and McHenry, the error is harmless because he admitted his aim was to scare the putative victims by driving close to them and admitted this conduct could be viewed as reckless driving. Since the recklessness required for reckless driving is a higher standard than negligence, it subsumes negligence.

We also conclude the jury was required under the instruction given to find this conduct would probably and directly result in the application of physical force upon Dircksen and McHenry and there is substantial evidence to support that finding.

## VII-IX*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### DISPOSITION

The judgment is affirmed

Sims, J., and Morrison, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 16, 2002. Kennard, J., was of the opinion that the petition should be granted.

---

*See footnote 3, *ante*, page 706.